### UNITED STATES v. PARAMOUNT PICTURES, Inc., et al.

District Court, S. D. New York.
June 11, 1946.

Wendell Berge, Asst. Atty. Gen., Robert L. Wright, Philip Marcus, Elliott H. Moyer, and John R. Niesley, Sp. Assts. to the Atty. Gen., Frank W. Gaines, Jr., of Washington, D.C., Gerald A. Herrick, of Falconer, N. Y., Robert B. Hummel, of Washington, D. C., Harold Lasser, of Newark, N. J., Kenneth R. Lindsay, of Washington, D. C., James M. McGrath, of San Francisco, Cal., Horace T. Morrison, of San Francisco, Cal., and Fred A. Weller, of Los Angeles, Cal., for the United States.

Simpson Thacher & Bartlett, of New York City (Whitney North Seymour, Louis Phillips, Albert C. Bickford, and Armand F. MacManus, all of New York City, of counsel), for Paramount defendants.

Davis, Polk, Wardwell, Sunderland & Kiendl and J. Robert Rubin, all of New York City (John W. Davis, J. Robert Rubin, C. Stanley Thompson, Benjamin Melniker, and S. Hazard Gillespie, Jr., all of New York City, of counsel), for defendant Loew's, Inc.

George S. Leisure, Ralstone R. Irvine, Granville Whittlesey, Jr., and Gordon E. Youngman, all of New York City (Roy W. McDonald and Donovan Leisure Newton & Lumbard, all of New York City, of counsel), for Radio-Keith-Orpheum Corporation, RKO Radio Pictures, Inc., Keith-Albee-Orpheum Corporation, RKO Proctor Corporation and RKO Midwest Corporation.

Joseph M. Proskauer and Robert W. Perkins, both of New York City (J. Alvin Van Bergh, both of New York City, and Howard Levinson, of counsel), for the Warner defendants.

Dwight, Harris, Koegel & Caskey, of New York City (John Fletcher Caskey and Frederick W. R. Pride, both of New York City, of counsel), for defendants Twentieth Century-Fox Film Corporation and National Theatres Corporation.

Schwartz & Frohlich, of New York City (Louis D. Frohlich, Arthur H. Schwartz, Irving Moross, and Max H. Rose, all of New York City, of counsel), for defendant Columbia.

Charles D. Prutzman, of New York City, for the Universal defendants.

O'Brien, Driscoll & Raftery, of New York City (Edward C. Raftery, Arthur F. Driscoll, Chas. D. Prutzman, George A. Raftery, and Adolph Schimel, all of New York City, of counsel), for defendant United Artists Corporation.

Before AUGUSTUS N. HAND, Circuit Judge, and GODDARD and BRIGHT, District Judges.

AUGUSTUS N. HAND, Circuit Judge.

The United States brought suit under Section 4 of the Act of Congress of July 2, 1890, 15 U.S.C.A. § 4, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act, in order to prevent alleged violations by the defendants of Section 1 and 2 of that Act, 15 U.S.C.A. §§ 1, 2.

The following is a general description of the defendants:

1. (a) Paramount Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1501 Broadway, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

(b) Paramount Film Distributing Corporation, a wholly owned subsidiary of Paramount Pictures, Inc., is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1501 Broadway, New York, New York, and is engaged in the distribution branch of the industry.

2. Loew's, Incorporated, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1540 Broadway, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

3. (a) Radio-Keith-Orpheum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated corporations, in various parts of the United States and in foreign countries.

(b) RKO Radio Pictures, Inc., a wholly owned subsidiary of Radio-Keith-Orpheum Corporation, is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the production and distribution branch of the industry.

(c) Keith-Albee-Orpheum Corporation is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of exhibiting motion pictures. Approximately 99% of its common stock and 33% of its preferred stock are held by Radio-Keith-Orpheum Corporation.

(d) RKO Proctor Corporation, a wholly owned subsidiary of Radio-Keith-Orpheum Corporation, is a corporation organized and existing under the laws of the State of New York, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of exhibiting motion pictures.

(e) RKO Midwest Corporation, a wholly owned subsidiary of Radio-Keith-Orpheum Corporation, is a corporation organized and existing under the laws of the State of Ohio, with a place of business at 1270 Sixth Avenue, New York, New York, and is engaged in the business of exhibiting motion pictures.

4. (a) Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 321 West 44th Street, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

(b) Vitagraph, Inc., a wholly owned subsidiary of Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with a place of business at 321 West 44th Street, New York, New York, and is engaged in the business of distributing motion pictures.

(c) Warner Bros. Circuit Management Corporation, a wholly owned subsidiary of Warner Bros. Pictures, Inc., is a corporation organized and existing under the laws of the State of New York, with a place of business at 321 West 44th Street, New York, New York, and, among other things, acts as booking agent for the exhibition interests of the said Warner Bros. Pictures, Inc.

5. (a) Twentieth Century-Fox Film Corporation is a corporation organized and existing under the laws of the State of New York, having its principal place of business at 444 West 56th Street, New York, New York, and is engaged in the business of producing, distributing, and exhibiting motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

(b) National Theatres Corporation is owned and controlled by Twentieth Century-Fox Film Corporation, and is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 2854 Hudson Boulevard, Jersey City, New Jersey, and is a holding company for the theatre interests of the said Twentieth Century-Fox Film Corporation.

6. (a) Columbia Pictures Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 729 Seventh Avenue, New York, New York, and is engaged in the business of producing and distributing motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States and in foreign countries.

(b) Screen Gems, Inc., a wholly owned subsidiary of Columbia Pictures Corporation, is a corporation organized and existing under the laws of the State of California, with a place of business at 700 Santa Monica Boulevard, Hollywood, California, and is engaged in the business of producing motion pictures.

(c) Columbia Pictures of Louisiana, Inc., a wholly owned subsidiary of Columbia Pictures Corporation, is a corporation organized and existing under the laws of the State of Louisiana, with a place of business at 150 South Liberty Street, New Orleans, Louisiana, and is engaged in the business of distributing motion pictures.

7. (a) Universal Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of producing and distributing motion pictures, either directly or through subsidiary or associated corporations, in various parts of the United States and in foreign countries.

(b) Universal Pictures Company, Inc., a subsidiary controlled by Universal Corporation, is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of producing motion pictures.

(c) Universal Film Exchanges, Inc., a wholly owned subsidiary of Universal Pictures Company, Inc., is a corporation organized and existing under the laws of the State of Delaware, with a place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of distributing motion pictures.

(d) Big U Film Exchange, Inc., a wholly owned subsidiary of Universal Corporation and Universal Pictures Company, Inc., is a corporation organized and existing under the laws of the State of New York, with a place of business at 1250 Sixth Avenue, New York, New York, and is engaged in the business of distributing motion pictures.

8. United Artists Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 729 Seventh Avenue, New York, New York, and is engaged in distribution of motion pictures in various parts of the United States and in foreign countries.

The five major defendants—Paramount Pictures, Inc., Loew's Incorporated, Radio-Keith-Orpheum Corporation, Warner Bros. Pictures, Inc., and Twentieth Century-Fox Film Corporation, and their subsidiaries—were charged in the amended and supple-

mental complaint with combining and conspiring unreasonably to restrain trade and commerce in the production, distribution and exhibition of motion pictures and to monopolize such trade and commerce in violation of the Sherman Act. The three minor defendants—Columbia Pictures Corporation, Universal Corporation, and their subsidiaries, which are producers and distributors, and not exhibitors, and United Artists Corporation, which is a distributor only, were likewise charged with combining and conspiring with the five major defendants and with each other unreasonably to restrain and to monopolize trade and commerce in motion pictures. As it appeared upon the trial that there was no violation of the Sherman Act in respect to production of motion pictures and that there was on the contrary active competition in production, the charge in respect to production was formally abandoned by the plaintiff. The issues therefore are whether there have been illegal restraints or monopolization in the distribution and exhibition of motion pictures.

The plaintiff contends that an illegal conspiracy and monopoly were effected by: (1) concertedly fixing the license terms before the licensees have had a fair opportunity to estimate the value and character of the films licensed and before such films were completed or shown; (2) concertedly fixing the run, clearance, and minimum admission price terms on which an exhibitor may show pictures through license agreements covering periods of a year or more; (3) concertedly conditioning the licensing of one film or group of films upon the licensing of another film or group of films and by conditioning the licensing of films in one theatre or group of theatres upon the licensing of films in other theatres or group of theatres; (4) concertedly discriminating with respect to the license terms granted to theatres in large circuits because such theatres are part of a circuit. The means of such discrimination are said to be the licensing for exhibition in theatres of the five defendant exhibitors of runs ahead of those granted to competing independent exhibitors, and the continuance of these prior runs from season to season to the prejudice of independent exhibitors.

As a result independent exhibitors are systematically excluded from the opportunity to procure preferred runs of pictures distributed by the defendants in the localities in which defendants' theatres operate and at times refused any run at all in order to protect defendants' theatres from competition.

It is further charged by the plaintiff that the distributor-exhibitor defendants have combined with each other: (1) by conditioning the licensing of films distributed by one defendant in theatres operated by another upon the licensing of films distributed by the latter in the theatres operated by the former; (2) by excluding independently produced films from affiliated theatres and by excluding unaffiliated exhibitors from competing with first run or other run theatres in cities and towns where affiliated theatres are located; (3) by excluding unaffiliated exhibitors from operating theatres on the same run as affiliated exhibitors; (4) by using the first and early runs of affiliated theatres to control the film supply, runs, clearances and admission prices of operators of competing unaffiliated theatres in cities and towns in which affiliated theatres are located; (5) by pooling or otherwise sharing with each other the profits of affiliated theatres owned or controlled by two or more exhibitor defendants located in the same competitive area and frequently by together operating on the same run in cases where they would be in competition with one another except for such pooling or profit sharing agreements; (6) by effecting a division of the territory of the entire United States among them for theatre operating purposes.

The amended and supplemental complaint prays: (1) That each of the contracts, combinations and conspiracies in restraint of trade, together with attempts to monopolize the same, be declared illegal; (2) that the defendants and their subsidiaries be perpetually enjoined from continuing to carry out attempts at monopolization and all restraints of trade in distribution and exhibition of motion pictures; (3) that a nation-wide system of impartial arbitration tribunals, or such other means of enforcement as the court may deem proper, be established in order to secure adequate

enforcement of whatever general and nation wide prohibitions of illegal practices may be contained in the decree; (4) that the five major defendants and their subsidiaries be directed to divest themselves of all interest and ownership, both direct and indirect, in any theatres which the court shall find to have been used by one or more of them unreasonably to restrain trade and commerce in motion pictures.

After the amended and supplemental complaint was filed, the plaintiff and the five major defendants and their subsidiary corporations that were parties to the suit, executed a written consent to the entry of a decree by the District Court, signed November 20, 1940. A decree was made in accordance with the consent reciting that no testimony had been taken, that no provision of the decree should be construed as an admission or adjudication that any of the plaintiff's charges were true, or that the consenting defendants had violated any law, or that the doing or the failure to do any of the acts or things enjoined or directed to be done would constitute a violation of law.

The decree enjoined the consenting defendants as follows:

(1) No distributor defendant shall license feature motion pictures for public exhibition within the United States at which an admission fee is to be charged until the feature has been trade shown within the exchange district in which the exhibition is to be held.

(2) No distributor defendant shall offer for license or shall license more than five features in a single group. The license of one group of features shall not be conditioned upon the licensing of another feature or group of features, nor shall any distributor defendant require an exhibitor to license shorts, reissues, westerns, or foreigns as a condition of licensing other features. Disputes as to violation of these provisions shall be subject to arbitration. The power of the arbitrator shall be limited to a determination of whether the offer to license or the license was conditioned and, if found to be conditioned, to imposing a penalty against the distributor of not to exceed $500.

(3) No license for features to be exhibited in theatres located in one exchange district shall include theatres located in another exchange district.

(4) No distributor defendant shall refuse to license its pictures for exhibition in an exhibitor's theatre on some run to be designated by the distributor upon terms and conditions fixed by the distributor, if the exhibitor can satisfy reasonable minimum standards of theatre operation and is reputable and responsible, unless the granting of a run on any terms will have the effect of reducing the distributor's total film revenue in the competitive area in which such exhibitor's theatre is located. Controversies arising from a complaint by an exhibitor for violation of the foregoing provision shall be subject to arbitration under which an award based on a finding of violation shall direct the distributor to offer its pictures to the complainant on a run to be designated by the distributor, and upon terms fixed by the distributor, which are not calculated to defeat the purposes of this subdivision.

(5) Controversies arising from the complaint of an exhibitor that a feature licensed by a distributor defendant for exhibition in a particular theatre is generally offensive in the locality on moral, religious, or racial grounds shall be subject to arbitration, and, if the feature shall be found to be thus offensive, an award shall be made cancelling the license in so far as it relates to the exhibition of the feature in that theatre.

(6) Controversies arising upon the complaint of an exhibitor that the clearance applicable to his theatre is unreasonable shall be subject to arbitration. Reasonable clearance as to time and area was stipulated and held by the consent decree to be essential to the distribution and exhibition of motion pictures. In determining whether a clearance complained of is unreasonable the arbitrator should consider the historical development of clearance in the area, the admission price of the theatres involved; their character, location, and type of entertainment; the rental terms and license fees paid by them; the extent to which they compete for patronage, and all other business considera-

tions except affiliation of the theatres with a distributor or with a circuit of theatres. If the clearance be found unreasonable, the award shall fix the maximum clearance between the theatres involved, which may be granted in licenses thereafter entered into by a distributor that is party to the arbitration. The award may also fix, subject to the provisions of Section XVII of the consent decree, such maximum clearance under any existing franchise, i.e., a licensing agreement, or a series of licensing agreements, covering more than one motion picture season and covering the exhibition of pictures released by the distributor during the entire period of the agreement. Nothing contained in this subdivision, nor any award in arbitration, shall restrict the exhibitor's right to license for any theatre any run which it is able to negotiate, nor shall restrict the distributor's right to license any run which it desires to grant, nor to license the exhibition of any special feature under a contract the terms of which, including provisions for clearance, are applicable only thereto.

(7) Controversies arising upon a complaint by an independent exhibitor that a distributor defendant has arbitrarily refused to license its features for exhibition on the run requested by the exhibitor in one of the latter's theatres shall be subject to arbitration, but the making of any award is to be subject to certain specified conditions and no award made shall affect the license to exhibit any feature then under license, but only future licenses.

(8) For three years after the entry of the decree, the consenting defendants are to notify the Department of Justice of any legally binding commitment for the acquisition of any theatre or theatres. During such period, each defendant is to report monthly the changes in its theatre position, together with a statement for the reason of such changes. For three years following the entry of the decree, no consenting defendant shall enter upon a general program of expanding its theatre holdings. Nothing shall prevent any such defendant from acquiring theatres or interests therein to protect its investment or its competitive position or for ordinary purposes of its business.

(9) The decree shall not be construed to limit, impair or alter the right of a distributor to license the exhibition of motion pictures, subject to such terms as may be satisfactory to it, (a) in any theatre in which, or in the proceeds of which, it is directly or indirectly interested; (b) in any theatre an interest in which of not less than 50% is acquired after the date of the decree and which it owns at the time of such license, and (c) in any theatre of which a company in which the defendant owned not less than 42% of the common stock at the date of the decree and at the time of such license acquires after the date of the decree and owns at the time of such license a financial interest of not less than 50%.

(10) Except as otherwise expressly and specifically provided in the decree, nothing therein shall be construed to limit the right of any distributor to select its own customers, bargain with them in accordance with law, or negotiate with or license to or accept any offer from any exhibitor to license its motion pictures or any number thereof, upon such terms and conditions as it deems advisable or to its best interests.

(11) For a period of three years after the entry of the consent decree the plaintiff shall not seek either in this or any other action against the consenting defendants to divorce the production or distribution of motion pictures from their exhibition or to dissolve any defendant or any corporation in which it has directly or indirectly a substantial stock interest and which is engaged in the exhibition of motion pictures, or holds directly or indirectly a substantial stock interest in any corporation so engaged, or to dissolve or break up any circuit of theatres of any such defendant or of any such corporation, or to require any such defendant, corporation or circuit to divest itself of its interests or any thereof in motion picture theatres in which it had an interest at the time of the entry of the decree.

(12) The method and conditions of and the procedure for the arbitration of controversies and the powers of an appeal board

created by the court to entertain appeals from the arbitration tribunal are set forth in the decree.

(13) Jurisdiction is retained by the decree for the purpose of enabling any parties to apply to the court at any time more than three years after the date of the entry for any modification thereof.

The three minor defendants and their subsidiaries did not consent to the decree of November 20, 1940, presumably because of their opposition to the provisions requiring trade-showing and prohibiting block-booking of groups of more than five films. It was provided that if the plaintiff did not secure the entry of a decree against the three minor defendants before June 1, 1942, the consenting defendants were to be released from those provisions. Such a decree was in fact not entered by the specified date, and accordingly the sections of the decree regarding trade-showing and block-booking have lapsed. Nevertheless, according to the testimony, the consenting defendants have continued to comply with them.[1]

Counsel for the five major defendants and their subsidiaries contend that the consent decree has, in some respects at least, the effect of a final judgment which may not be modified. But we cannot see how such a position is consistent with the language of Section XXIII(d), which permits " * * * any of the parties to this decree to apply to the Court at any time more than three years after the date of the entry of the decree for any modification thereof." That period has expired, and therefore everything relating to rights under and remedies for violation of the Sherman Act is, therefore, open for consideration, even as between consenting parties; and certainly nothing has hitherto been decided which affected the non-consenting parties. It would seem to follow that we cannot bind any parties to subject themselves to the arbitration system or the board of appeals set up in aid of it without their consent, even though we may regard it as desirable that such a system, in view of its demonstrated usefulness, should be continued in aid of the decree which we propose to direct.

---

[1] The following are definitions of terms used in this opinion:

Block-booking—The practice of licensing, or offering for license, one feature, or group of features, upon condition that the exhibitor shall also license another feature or group of features released by the distributor during a given period.

Clearance—The period of time, usually stipulated in license contracts, which must elapse between runs of the same picture within a particular area or in specified theatres.

Exchange District—An area in which an office is maintained by a distributor for the purpose of soliciting license agreements for the exhibition of its pictures in theatres situated throughout the territory served by the exchange and for the physical distribution of such films throughout this territory.

Feature—Any motion picture, regardless of topic, the length of the film of which is in excess of 4,000 feet.

Formula Deal—A licensing agreement with a circuit of theatres in which the rental price of a given film is measured for the circuit as a whole by a specified percentage of the picture's national gross.

Franchise—A licensing agreement, or series of licensing agreements, entered into as part of the same transaction, in effect for more than one motion picture season and covering the exhibition of pictures released by one distributor during the entire period of the agreement.

Independent—A producer, distributor, or exhibitor, as the context requires, which is not a defendant in this action or a subsidiary or affiliate of a defendant.

Master Agreement—A licensing agreement, also known as a "blanket deal", covering the exhibition of films in a number of theatres, usually comprising a circuit.

Motion Picture Season—A one-year period beginning about September 1 of each year.

Road-show—A public exhibition of a motion picture in a limited number of theatres, in advance of its general release, at admission prices higher than those customarily charged in first-run theatres in the areas where they are located.

Runs—The successive exhibitions of a motion picture in a given area, first-run being the first exhibition in that area, second-run being the next subsequent, and so on.

Trade-showing—A private exhibition of a film prior to its release for public exhibition, as required by Section III of the consent decree.

The evidence has established various infractions of the Sherman Act on the part of each of the defendants which we shall proceed to discuss.

### PRICE-FIXING

The defendants who have granted moving picture licenses have fixed minimum admission prices which the exhibitor agrees to charge irrespective of whether it is to pay a flat rental or a percentage of the theatre receipts. It is said that these minimum admission prices are in general only those currently charged by the exhibitors and that they are placed in the licenses in order to assure the distributor of a minimum revenue when it licenses upon a percentage basis, and also to assure a continuation of the conditions which moved it to grant a given run to the exhibitor.[2] Whatever the reason, the various licensing defendants have agreed with their licensees to a system which determines minimum admission prices in all theatres where motion pictures licensed by them are exhibited. In this way are controlled the prices to be charged for most of the motion pictures exhibited either by the defendants, or by independents, within the United States. That the eight defendants distribute most of the features is evident from the record. For example, during the 1943–44 season the eight defendants distributed about 77.6% of all features nationally distributed except "westerns" and low cost productions, and even if the latter inferior and non-competitive pictures are included, they distributed 65.5%. See Plaintiff's Exhibit 426; Record p. 2400. The control of distribution closely resembles that appearing in Goldman Theatres, Inc., v. Loew's Inc., 3 Cir., 150 F.2d 738, 744, 745, where the court said: "Defendants control the production and distribution of more than 80% of feature pictures in this country, and no exhibitor can successfully operate without access to defendants' product."[3]

■ The licenses are in effect price-fixing arrangements among all the distributor-defendants, as well as between such defendants individually and their various exhibitors. Such combinations we hold to be forbidden by the Sherman Act.

The exhibits submitted in this case contain numerous express agreements between the various distributing defendants and their licensees stating the minimum admission prices which licensees are required to maintain in showing the distributors' pictures in the areas concerned. The agreements are not only between the distributor-defendants and other defendants owning theatres, but also between the distributor-defendants and independent theatre owners. A correlation of these agreements shows that in many instances the minimum prices set forth in the license agreements by the various defendants are in substantial conformity. Indeed, it is conceded in the joint brief filed on behalf of Loew's, Paramount, Warner, RKO and Twentieth Century-Fox that the admission prices included in licenses of the various distributor-defendants are in general uniform, being the usual admission prices currently charged by the exhibitors. At pages 31, 32 of the joint brief it is stated: "The testimony shows that it is the general practice of all the distributors, whether dealing with independent exhibitors or affiliated ones, to include a provision in the license agreement that the exhibitor shall not charge less than a specified minimum admission price during the exhibition of the particular picture or pictures licensed. * * * The minimum admission price included in the license is not one which the distributor dictates, but is the usual admission price currently charged by the ex-

---

[2] That the distributor-defendants have more than merely a passive interest, as they claim, in the maintenance of specified minimum prices is shown by their inclusion in the licenses of provisions for severe penalties if less than those prices are charged. Some licenses provide that if the schedule of minimum prices is violated, all existing licenses of the distributor for that theatre may be cancelled at the option of the distributor; other licenses provide that the particular license may be cancelled or that the exhibitor's clearance over subsequent runs be greatly reduced. See Plaintiff's Exhibits 275–290.

[3] The defendants in the Goldman case were substantially the same as those here, except that Universal Corporation was there eliminated by agreement

hibitor. (R. 433, 718, 968, 999, 1382–1383). It is the practice of exhibitors to charge the same scale of admission prices over a period of time and not to change them according to whose pictures are being exhibited or according to any fluctuations in the type of picture." A similar statement is made at page 18 of the brief of Columbia, and the brief of United Artists and Universal appears to argue on the same assumption at pages 24–39.

It does not seem important whether the distributor was the more controlling factor in determining the minimum admission prices. Whether it was such a factor or merely acceded to the customary prices of the exhibitors, in either event there was a general arrangement of fixing prices in which both distributors and exhibitors were involved. But it is plain that the distributor did more than accede to existing price schedules.[4] The licenses required them to be maintained under severe penalties for infraction, and the evidence shows that the distributors in the case of exceptional features, where not satisfied with current prices, would refuse to grant licenses unless the prices were raised.[5] Moreover, the distributors, when licensing on a percentage basis, were interested in the prices charged and even when licensing for a flat rental were interested in admission prices to be charged for subsequent runs which they might license on a percentage basis. Likewise all of the five major defendants had a definite interest in keeping up prices in any given territory in which they owned theatres, and this interest they were safeguarding by fixing minimum prices in their licenses when distributing their films to independent exhibitors in those areas. Even if the li-

---

[4] Reagan, vice-president in charge of distribution and sales for Paramount, testified as follows:

"Q. Well, does that (the admission price) fix his right to a particular run or to clearance? A. It would have an influence upon the run and clearance, yes sir."

\* \* \* \* \* \* \*

"Q. Why would you be interested in the minimum admission price or the admission price charged by the exhibitor in connection with determining what run you would negotiate for? A. Because the admission price that he charges determines the film rental that I can earn for my pictures." Record pp. 718–719.

See also testimony of Kupper in charge of distribution organization of RKO. Record p. 1084.

[5] Testimony of John J. Friedl, president of Minnesota Amusement Company —the stock of which is owned by Paramount, was as follows:

"Q. Are there occasional instances of special attractions where there is a negotiation as to a higher admission price with the distributor? A. That has come up on several occasions. In the case of the picture 'Woodrow Wilson', and several other pictures, they have been released by the distributors as road show attractions, and in those cases the distributors insisted upon road show prices, and it was the option of the purchaser, or the theatre, to buy or not to buy those pictures at those prices; but if he expected to play the picture at that time, he would have to charge such admission price.

"Q. And if he was not willing to advance his admission price to meet the distributor's terms, he had the opportunity to play this picture on regular run, is that right? A. At a later date, that is correct.

"Q. Is the provision for that minimum admission price included not only in license contracts for first-run exhibition but also for subsequent-run exhibitions? A. Yes, I think it applies in all cases.

"Q. Is it included in license contracts for percentage pictures and also for flat rental pictures? A. Yes, sir.

"Q. Where the admission price is included for subsequent-run exhibition, does your answer with respect to who determines the admission price apply to that as well? A. That is correct. But, of course, it is reasonable to assume, to understand, that in setting our admission prices, we do not do that on an arbitrary basis because it is reasonable to expect that the larger theatres playing the first-runs would get the maximum price for the protection of the distributor and the producer. And in the secondary houses the prices are less.

"Q. That is, generally speaking, the first-run houses charge a higher price than subsequent-run, and then the prices step down among the runs? A. That is correct." Record p. 1000.

censes were at a flat rate, a failure to require their licensees to maintain fixed prices would leave them free by lowering the current charge to decrease through competition the income in the licensors' own theatres in the neighborhood. The whole system presupposed a fixing of prices by all parties concerned in all competitive areas.

The similarity of specified minimum prices prescribed for the same theatres in the distributor-defendants' contracts of license is shown by the following table collated from exhibits in evidence.[6] The ex-

[6] This table is derived from Plaintiff's Exhibits 41, 42, 57 (1–49), 82, 94, 126, 127, 128, 139, 365, 369. In most of the exhibits there was no indication as to whether the admission price given included or excluded taxes. When this information was given in the exhibits, it is stated in the table as "tax incl.", or "tax excl." The word "none" is used to mean that though a license was in evidence, no admission price was specifically stated in the contract, either through inadvertence or on the understanding that the admission prices currently being charged or contained in previous licenses would be continued. Record pp. 433, 724, 782, 1082, 1211. The symbol "x" is used to indicate that no license of that distributor for that particular theatre was in evidence.

| Theatre | City, State | Paramount | Loew's | Warner | RKO | Fox | Col. | U. A. | Univ. |
|---|---|---|---|---|---|---|---|---|---|
| Sneicer | Akron, Ohio | 30¢ tax excl. | 27¢ | 30¢ | 30¢ | x | x | 30¢ | x |
| Bailey | Buffalo, N. Y. | 30¢ | x | 30¢ | none | 27¢ | 29¢ | none | x |
| Liberty | Covington, Ky. | 28¢ tax excl. | x | 33¢ tax incl. | none | x | x | x | x |
| Madison | Covington, Ky. | 28¢ tax excl. | 28¢ | x | none | 28¢ | x | x | x |
| LaSalle | Niagara Falls, N. Y. | 30¢ tax incl. | 27¢ | x | none | 27¢ | x | x | x |
| Paramount | Akron, Ohio | 20¢ tax excl. | 22¢ | 25¢ | none | 20¢ | x | 25¢ | x |
| Capitol | Cleveland, Ohio | 30¢ | 27¢ | 30¢ | x | 30¢ | x | x | x |
| Shaker | Cleveland, Ohio | 35¢ tax excl. | x | 35¢ | x | 35¢ | x | 35¢ | x |
| Heights | Cleveland Hts Ohio | 30¢ tax excl. | 27¢ tax incl. | 30¢ | none | 30¢ | x | x | x |
| Senate | Detroit, Mich. | x | 37¢ | 35¢ | none | 35¢ | x | none | x |
| Ritz | Baltimore, Md. | x | 25¢ | 28¢ tax incl. | none | 25¢ | x | none | 25¢ |
| Vilma | Baltimore Md. | x | 25¢ | 28¢ | none | 25¢ | x | none | x |
| Centre | Baltimore Md. | x | 30¢ | 33¢ tax incl. | x | 30¢ | x | x | 30¢ |
| Hampden | Baltimore Md. | x | x | x | x | 27¢ | x | 27¢ | 25¢ |
| Columbia | Baltimore Md. | x | 25¢ | 28¢ | none | 25¢ | x | x | 25¢ |
| Broadway | Baltimore Md. | x | 27¢ | x | x | 27¢ | x | 27¢ | 25¢ |
| Apollo | Baltimore Md. | x | 25¢ | x | x | 27¢ | x | 25¢ | 25¢ |
| Irvington | Baltimore Md. | x | x | 28¢ | 25¢ | 25¢ | x | x | 25¢ |
| Montevista | Cincinnati Ohio | 30¢ | 30¢ | x | 33¢ | x | x | 30¢ | x |
| 20th Century | Cincinnati Ohio | 29¢ tax excl. | 30¢ | x | 30¢ | x | x | 30¢ | x |
| Jackson | Cincinnati Ohio | 29¢ tax excl. | x | x | x | x | x | 30¢ | x |
| Esquire | Cincinnati Ohio | 29¢ tax excl. | x | x | x | x | x | 30¢ | x |

hibits used to prepare the table contained answers of the defendants to plaintiff's interrogatories about the first block of five features licensed for the 1943–44 season by each of the five major distributor-defendants, and about the first five pictures licensed by each of the three minor defendants, and about that picture of each defendant which during the season received the most billings in the United States.

It is apparent from the foregoing that there was great similarity and in many cases identity in the minimum prices fixed for the same theatre in the licenses of all the defendants. Where there was a marked difference in price, as for example in the admissions specified by RKO, Columbia and Universal, in a theatre in Charleston, South Carolina, it is likely to have been due to the showing of a picture of a different class from the others, or upon a different run.

Such uniformity of action spells a deliberately unlawful system, the existence of which is not dispelled by the testimony of interested witnesses that one distributor does not know what another distributor is doing; and there can, in our opinion, be no reasonable inference that the defendants are not all planning to fix minimum prices to which their licensees must adhere. See Record p. 1322.

In addition, several of the exhibits disclose operating agreements between the five distributor-defendants who are also theatre owners, or between them and independent theatre owners in which joint operation of the theatres covered by the agreements is provided and minimum admission prices to be charged are either

| Theatre | City, State | Paramount | Loew's | Warner | RKO | Fox | Col. | U. A. | Univ. |
|---|---|---|---|---|---|---|---|---|---|
| Sunset | Cincinnati Ohio | 29¢ tax excl. | x | x | x | x | x | 30¢ | x |
| Westwood | Cincinnati Ohio | 29¢ tax excl. | x | x | x | x | x | 30¢ | x |
| Lawrence | New Haven Conn. | 27¢ | 27¢ | 33¢ | 27¢ | 27¢ | x | 25¢ | x |
| Westville | New Haven Conn. | 30¢ | 30¢ | 33¢ | none | 30¢ | x | 30¢ | x |
| Pequot | New Haven Conn. | 30¢ | 30¢ | 33¢ | 30¢ | x | x | 33¢ | x |
| Whalley | New Haven Conn. | 30¢ | 30¢ | 33¢ | none | 30¢ | x | 30¢ | x |
| Hamilton | Indianapolis Ind. | 35¢ | x | 35¢ | 35¢ | 35¢ | x | x | x |
| Sunshine | Albuquerque N. M. | none | 40¢ | x | 42¢ | 40¢ | 30¢ | x | x |
| Rio | Appleton Wisc. | 40¢ | 46¢ | none | none | 45¢ tax incl. | none | x | 46¢ plus 9¢ tax |
| Rex | Beloit Wisc. | 36¢ | 27¢ | 40¢ | 35¢ | 36¢ tax incl. | 35¢ | x | 42¢ plus 8¢ tax |
| Capitol | Charlestown W. Va. | x | 40¢ | x | 40¢ | x | x | x | x |
| Albee | Huntington W. Va. | 40¢ | 40¢ | 34¢ | 35¢ | 40¢ | x | x | 40¢ |
| Reed | Alexandria Va. | 35¢ | 35¢ | 39¢ tax incl. | none | 35¢ | 37¢ | x | 35¢ |
| Rosna | Norfolk, Va. | 27¢ | 27¢ | x | x | x | x | x | x |
| Flynn | Burlington Vt. | 25¢ | 36¢ | x | 35¢ | 40¢ | x | x | x |
| Gloria or Riviera | Charleston S. C. | 40¢ | 40¢ | 44¢ | 27¢ | 40¢ | 15¢ | x | 35¢ |
| Stadium | Woonsocket R. I. | 40¢ | 40¢ | x | none | x | x | x | x |
| Bijoux | Woonsocket R. I. | x | x | x | 44¢ | 35¢ | 35¢ | x | 30¢ |

stated therein, or are to be jointly determined by other means. Apparently those particular price-fixing agreements do not involve the three minor defendants or their subsidiaries. For example, in Plaintiff's Exhibit 220 there are agreements between subsidiaries of Loew's and Warner, covering the period of May 5, 1938 to August 31, 1947, according to which the admission prices for three theatres in Pittsburgh—two of Warner and one of Loew's—are to be fixed by a joint committee. In Plaintiff's Exhibit 218, an agreement between Warner and Paramount provides that from March 1, 1936, to August 31, 1953, two theatres previously operated by Warner, and one theatre previously operated by Paramount in Hammond, Indiana, should be managed by Warner Bros. Circuit Management Corporation and the then present scale of admission prices maintained. By other agreements in Plaintiff's Exhibit 219, RKO and Warner provided for joint operation from August 27, 1937, to August 31, 1950, of five theatres in Cleveland—three of RKO and two of Warner—for which minimum prices are to be determined by a joint operating committee. See also, e.g., Plaintiff's Exhibit 229 (Warner and independent); Exhibit 213 (Loew's and independents); Exhibit 202 (RKO and independent); Exhibits 226, 226a (Paramount, Warner, and independent); Exhibit 223 (Warner and independent); Exhibit 386 (Paramount, RKO and independent); Exhibits 238, 239 (Fox and independents); Exhibit 387 (Paramount, RKO and independent); Exhibit 206 (RKO and Paramount); Exhibit 221 (Warner and Paramount); Exhibit 209 (RKO and Paramount); Exhibit 205 (Paramount and independent). These agreements show the express intent of the major defendants to maintain prices at artificial levels.

As further evidence of a conspiracy among the distributors to fix prices, we find master agreements and franchises between various of the defendants in their capacities as distributors and various of the defendants in their capacities as exhibitors. These contracts stipulate minimum admission prices often for dozens of theatres owned by an exhibitor-defendant in a particular area of the United States.

Loew's as distributor, for example, fixed minimum prices for nearly all of Paramount's 133 theatres in Florida in an agreement covering the 1943–44 season. Plaintiff's Exhibit 57(11). In the Chicago area Loew's again as distributor specified prices in a single agreement for upwards of 50 theatres owned by a Paramount subsidiary, Balaban & Katz Corporation. Plaintiff's Exhibits 250, 173. United Artists as distributor also specified prices for the Balaban & Katz theatres in Chicago for the 1941–42 season. Plaintiff's Exhibit 369(6). Similarly, Loew's specified prices for the entire Warner circuit of theatres for the 1943–44 season, Plaintiff's Exhibit 57 (8–10, 21–22, 30, 32, 35, 38, 48); for the same season United Artists specified prices for five RKO theatres in Cincinnati, Plaintiff's Exhibit 274; Paramount for seven RKO theatres in Cincinnati, Plaintiff's Exhibit 240; Loew's for the same seven RKO theatres in Cincinnati, Plaintiff's Exhibit 248; Warner for forty or more RKO theatres in Greater New York, Plaintiff's Exhibit 126; Loew's for six Fox theatres in Los Angeles County, Plaintiff's Exhibit 249; Warner for subsequent run Paramount theatres in Detroit and Birmingham, Michigan, Plaintiff's Exhibit 244.

A master agreement between United Artists as distributor and Fox as exhibitor for the season 1938–39 covered distribution of pictures of five independent producers in Fox theatre circuits in Los Angeles, San Francisco, Salt Lake City, St. Louis, Milwaukee, Omaha, Denver, and other cities, all on a percentage basis. It contained the following clause: "Where pictures are licensed on a percentage rental basis the scale of admission prices to be not less than the scale of admission prices charged to view pictures of comparable quality exhibited by the exhibitor and distributed by distributors other than United Artists." The foregoing quotation shows an acquiescence of United Artists in admission prices fixed by any other distributor and an adherence to those prices in its own licenses. Plaintiff's Exhibit 199.

A franchise agreement between Universal Corporation as distributor and Interstate Theatres, Inc., and Texas Consolidated Theatres, Inc., for the seasons 1941–

44 is similar. Plaintiff's Exhibit 261. In each of the two latter companies Paramount had a 50% interest. The franchise covered pictures distributed by Universal to the theatres of the two licensees and contained the ordinary provisions for penalties if minimum admission prices were not maintained. See note 2 supra. While no minimum prices were specified in the agreements it is not really questioned that in such circumstances the current prices were implied as part of the contract. See Record pp. 433, 724, 782, 1082, 1210–1211.

There is also in evidence a franchise agreement between Columbia Pictures Corporation as distributor and Marcus Loew Booking Agency, a Loew's subsidiary, for the seasons 1944–46 covering pictures distributed to Loew's Metropolitan New York Circuit. Plaintiff's Exhibit 471. Minimum admission prices were not specified, but, as in other cases, were implied.

Licenses granted by one defendant to another for exhibition in only one theatre, while less striking evidence of conspiracy than the above master agreements and franchises, disclose the same inter-relationship among the defendants. Each of the five major defendants as a theatre-owning exhibitor has been licensed by the other seven defendants as distributors to exhibit the pictures of the latter at specified minimum prices. RKO, for example, as a theatre-owner, has been granted licenses with price restrictions by the other defendant-distributors. In turn, RKO, being itself a distributor, has granted similar licenses to the other four exhibiting defendants. We think that RKO, Loew's, Warner, Paramount and Fox, in granting and accepting licenses with minimum prices specified, have among themselves engaged in a national system to fix prices, and that Columbia, Universal and United Artists, in requiring the maintenance of minimum prices in their licenses granted to these exhibitor-defendants, have participated in that system.

■ It is a reasonable inference from all the foregoing that the distributor-defendants have acquiesced in the establishment of a price-fixing system and have conspired with one another to maintain prices. Such a conspiracy is per se a violation of the Sherman Act. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461.

■ Moreover, irrespective of the conspiracy among distributors to which we have referred, each distributor-defendant has illegally combined with its licensees, for in agreeing to maintain a stipulated minimum admission price, each exhibitor thereby consents to the minimum price level at which it will compete against other licensees of the same distributor whether they exhibit on the same run or not. The total effect is that through the separate contracts between the distributor and its licensees a price structure is erected which regulates the licensees' ability to compete against one another in admission prices. Each licensee knows from the general uniformity of admission price practices that other licensees having theatres suitable for exhibition of a distributor's picture in the particular competitive area will also be restricted as to maintenance of minimum prices, and this acquiescence of the exhibitors in the distributor's control of price competition renders the whole a conspiracy between each distributor and its licensees. An effective system of price control in which the distributor and its licensees knowingly take part by entering into price-restricting contracts is thereby created. That the combination is made up of a sum of separate licensing contracts, individually executed, does not affect its illegality, for tacit participation in a general scheme to control prices is as violative of the Sherman Act as an explicit agreement. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Goldman Theatres, Inc., v. Loew's Inc., 3 Cir., 150 F.2d 738.

■ This practice of stipulating minimum admission prices in the contracts of license is illegal in another respect. The differentials in price set by a distributor in

licensing a particular picture in theatres exhibiting on different runs in the same competitive area are calculated to encourage as many patrons as possible to see the picture in the prior-run theatres where they will pay higher prices than in the subsequent runs. The reason for this is that if 10,000 people of a city's population are ultimately to see the picture—no matter on what run—the gross revenue to be realized from their patronage is increased relatively to the increase in numbers seeing it in the higher-priced prior-run theatres. In effect, the distributor, by the fixing of minimum prices, attempts to give the prior-run exhibitors as near a monopoly of the patronage as possible. This, we believe, to be in violation of § 2 of the Sherman Act, at least when the distributor's own theatres are not exhibiting its picture on a prior-run and it is to theatres other than its own that it attempts to give a monopoly.

■ It is argued that the practice of minimum admission price-fixing is permitted under the Copyright Act, 17 U.S.C.A. § 1 et seq. But that act has never been held to sanction a conspiracy among licensors and licensees artificially to maintain prices. We do not question that the Copyright Act permits the owner of a copyrighted picture to exhibit it in its own theatres upon such terms as it sees fit, nor need we now decide whether a copyright owner may lawfully fix admission prices to be charged by a single independent exhibitor for the exhibition of its film, if other licensors and exhibitors are not in contemplation. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; cf. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. As other licensors and exhibitors are always in contemplation, so far as we can see, the question would appear academic.

This does not contravene the rule announced in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362, for there a license to only a single licensee—the Westinghouse Company—was involved, and, therefore, no conspiracy which sought to amplify the rights of the licensor under the Patent Act. The other question involved in that case was whether a patentee might lawfully require its bona fide agents to maintain minimum prices in selling the former's patented articles. The court held that it could. There is no claim here, however, that the exhibitors as licensees under the distributors' copyrights are agents in any sense, and we do not see that such a claim could be made. In any event, United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L. Ed. 1461, involved facts closely analogous to those here and affords ample basis for our decision.

■ Some argument has been made that the defendants' fixing of minimum admission prices is exempted from operation of the Sherman Act by the Miller-Tydings Amendment to that act, 1937, 50 Stat. 693, 15 U.S.C.A. § 1. The amendment pertains, however, only to "contracts or agreements prescribing minimum prices for the resale of a commodity", and the undisputed evidence is that the distributors merely grant licenses to the exhibitors for exhibition of their films and that title to none of their films at any time passes to the exhibitors. Furthermore, the distributor-defendants have engaged in a conspiracy, and the amendment explicitly states that despite its other provisions, contracts or agreements between "persons, firms, or corporations in competition with each other" to establish or maintain minimum prices remain illegal. United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408.

The foregoing holding that the defendants have all engaged in unlawful price-fixing does not prevent the distributors from continuing their present methods of determining film rentals; they may measure their compensation by stated sums, by a given percentage of a particular theatre's receipts, by a combination of these two, or by any other appropriate means. What is held to be violative of the Sherman Act is not the distributors' devices for measuring rentals, but their fixing of minimum admission prices which automatically regulates the ability of one licensee to compete

against another for the patron's dollar and tends to increase such prices as well as profits from exhibition.

If the exhibitors are not restrained by the distributors in the right to fix their own prices, there will be an opportunity for the exhibitors, whether they be affiliates or independents, to compete with one another. This is because one exhibitor by lowering admission prices will be able to compete with other exhibitors in obtaining patrons for his theatre—a competition which may well benefit both exhibitors and the public paying the admission fees.

## CLEARANCE AND RUN

Among provisions common to the licensing contracts of all the distributor-defendants are those by which the licensor agrees not to exhibit or grant a license to exhibit a certain motion picture before a specified number of days after the last date of the exhibition therein licensed. This so-called period of "clearance" or "protection" is stated in the various licenses in differing ways: in terms of a given period between designated runs, as for example in the Chicago area, Plaintiff's Exh. 369, see Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 150 F.2d 877, affirmed 327 U.S. 251, 66 S.Ct. 574, and as in Washington and New York, Plaintiff's Exh. 244, 471; in terms of admission prices charged by competing theatres, as "20 days over 30¢ theatres, 28 days over 25¢ theatres," Plaintiff's Exh. 57, 173, 178, 189; in terms of a given period of clearance over specifically named theatres, Plaintiff's Exh. 94, 181, 242, 253, 259; in terms of so many days' clearance over specified areas or towns, Plaintiff's Exh. 126, 175, 182, 182A, 183, 194, 244, 250, 255, 470, 476; in terms of clearances as fixed by other distributors, Plaintiff's Exh. 188, 417; or in terms of combinations of these formulae.

█ It appears to be plaintiff's contention that clearance practices inherently operate to produce unreasonable restrictions of competition among theatres and are therefore per se violative of the Sherman Act. With this we do not agree, for it seems to us that a grant of a clearance, when not accompanied by a fixing of minimum prices or not unduly extended as to area or duration, affords a fair protection to the interests of the licensee without unreasonably interfering with the interests of the public. At common law a vendor of income-producing property may validly covenant with his purchaser not to compete for a given time or within a given area so long as the restrictions are reasonably necessary to protect the value of the property purchased. Cincinnati, Portsmouth, Big Sandy & Pomeroy Packet Co. v. Bay, 200 U.S. 179, 26 S.Ct. 208, 50 L.Ed. 428; see Rogers v. Parry, 2 Cro. 326 (K.B. 1613); United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122. It is true that licenses of property rather than sales are here concerned and that the distributors covenant not only not to exhibit the films themselves, but also not to license them to others. Nevertheless, we believe these are not differences which affect the applicability of the common-law rule to the present case, for licenses between one distributor and one exhibitor with reasonable clearance provisions do not, in our opinion, involve anything unlawful. Such provisions are no more than safeguards against concurrent or subsequent licenses in the same area until the exhibitor whose theatre is involved has had a chance to exhibit the pictures licensed without invasion by a subsequent exhibitor at a lower price. It seems nothing more than an adoption of the common law rule to restrict subsequent exhibitions for a reasonable time within a reasonable area. While clearance may indirectly affect admission prices, it does not fix them and is, we believe, a reasonable restraint permitted by the Sherman Act. Standard Oil Co. v. United States 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; Westway Theatre, Inc. v. Twentieth Century-Fox Film Corp., D.C., 30 F.Supp. 830, affirmed on opinion below, 4 Cir., 113 F.2d 932; see United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

The costs of each black and white print is from $150 to $300, and of a technicolor

print is from $600 to $800. Many of the bookings are for less than the cost of the print so that exhibitions would be confined to the larger high-priced theatres unless a system of successive runs with a reasonable protection for the earlier runs is adopted in the way of clearance.

In Section VIII of the Consent Decree, moreover, there is the explicit statement to which all parties, including the plaintiff, consented. "It is recognized that clearance, reasonable as to time and area, is essential in the distribution and exhibition of motion pictures."

While, as previously stated, we do not deem ourselves bound by any provision of the consent decree, if we now find that it violates the Sherman Act, the forcefulness of the phrasing of this sentence indicates the proved utility of clearance practices in the movie industry and also their apparent necessity for a reasonable conduct of the business. Indeed, it is practically conceded that exhibitors would find extremely perilous the acceptance of licenses for the exhibition of films without assurance by the distributor that a nearby competitor would not be licensed to show the same film either at the same time or so soon thereafter that the exhibitor's expected income—perhaps on the basis of which he agreed to the specified rental—would be greatly diminished. Moreover, we understand the plaintiff to concede that the licensor may license its pictures for different successive dates. A reasonable clearance is in practical effect much the same. Either a license for successive dates, or one providing for clearance, permits the public to see the picture in a later-exhibiting theatre at lower than prior rates.

Several courts have previously considered the validity of clearances under the Sherman Act and have concluded that in the absence of an unconscionably long time or too extensive an area embraced by the clearance, or a conspiracy of distributors to fix clearances, there was nothing of itself illegal in their use. Westway Theatre, Inc., v. Twentieth Century-Fox Film Corp., D.C.Md., 30 F.Supp. 830, affirmed on opinion below, 4 Cir., 113 F.2d 932, and unreported cases therein cited; Gary Theatre Co. v. Columbia Pictures Corp., 7 Cir., 120 F.2d 891. We find the reasoning of these cases persuasive.

It is true that in some instances large theatre circuits by use of their great film-buying power have been able to negotiate successfully with the distributor-defendants for grants of unreasonable clearances or unjustified prior runs for their theatres. United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 150 F.2d 877, affirmed 327 U.S. 251, 66 S.Ct. 574; Goldman Theatres v. Loew's, 3 Cir., 150 F.2d 738; United States v. Schine Chain Theatres, Inc., D.C.W.D. N.Y., 63 F.Supp. 229. While we cannot find sufficient evidence to support an inference that the major defendants here. though controlling some of the largest circuits of theatres in the country and thus possessing potential weapons of great strength, have either collectively or severally entered upon a general policy of discriminating against independents in their grants of clearances, yet they have acquiesced in and forwarded a uniform system of clearances and in numerous instances have maintained unreasonable clearances to the prejudice of independents and perhaps even of affiliates. The decision of such controversies as may arise over clearances should be left to local suits in the area concerned, or, even more appropriately, to litigation before an Arbitration Board composed of men versed in the complexities of this industry.

In determining the reasonableness of the specific clearances which may come before these tribunals, they should consider whether the clearance has been set so as to favor affiliates or control the admission prices of the theatres involved. A distributor will naturally tend to grant a subsequent run to and clearance over a theatre for which the owner of his own volition sets a low admission price, for the distributor will be inclined to seek out the higher priced theatres first where the revenue is likely to be greater and consequently in case of licenses on a percentage basis where a percentage share will be higher. This, however, would seem the inevitable result of the competition for the distributor's films from theatres which are the larger or

better equipped, and for which higher admission prices may therefore be charged by their operators. Such competition the lower priced theatres must be prepared to meet, or else be content with subsequent runs and grants of clearance over them. The temptations to the distributor to use clearance grants to force a theatre to raise its prices and thus to qualify for prior runs having less clearance over it, and more clearance over competitors are nevertheless obvious and the courts or arbitration board should guard that this is not done. Clearance should be granted on the basis of theatre conditions which the exhibitor creates, not the distributor. The line to be drawn is indeed indistinct, but its existence is no less real.

■ In determining whether any clearance complained of is unreasonable, the following factors should be taken into consideration and accorded the importance and weight to which each is entitled, regardless of the order in which they are listed:

(1) The admission prices, as set by the exhibitors, of the theatres involved;

(2) The character and location of the theatres involved, including size, type of entertainment, appointments, transit facilities, etc.;

(3) The policy of operation of the theatres involved, such as the showing of double features, gift nights, give-aways, premiums, cut-rate tickets, lotteries, etc.;

(4) The rental terms and license fees paid by the theatres involved and the revenues derived by the distributor-defendant from such theatres;

(5) The extent to which the theatres involved compete with each other for patronage;

(6) The fact that a theatre involved is affiliated with a defendant-distributor or with an independent circuit of theatres should be disregarded; and

(7) There should be no clearance between theatres not in substantial competition.

■ The foregoing has been directed to the validity of clearance provisions resulting from separate negotiations between individual distributors and exhibitors in free and open competition with other distributors and exhibitors, and, as stated, we believe their reasonable use to be lawful. It is here claimed by plaintiff, however, that the distributor-defendants have acted in concert in the formation of a uniform system of clearances for the theatres to which they license their films and that the exhibitor-defendants have assisted in creating and have acquiesced in this system. This we find to be the case and hold to be in violation of the Sherman Act.

The following testimony warrants the inference that the defendants, as we found to be the case in the fixing of admission prices, have acted in concert in their grants of run and clearance. William F. Rodgers, general sales manager and vice-president of Loew's, testified that the field managers determine whether a theatre shall be licensed to exhibit on a first or on a subsequent run, that the clearance of a given theatre is more or less historical, except for that of new theatres, and that there has been very little change in clearance over a period of years. Record pp. 542, 543. Prior to 1943–44 Loew's license agreements provided that the clearance granted therein should apply to any theatre thereafter opened. Record p. 556.

Charles M. Reagan, vice-president of Paramount in charge of sales, stated that once clearance is agreed upon, it remains the same unless either exhibitor or distributor wants to change it. Record pp. 710, 711. There is a difference between a distributor's and an exhibitor's interest in the period of clearance granted. The distributor wants to get the most possible in film rental from all the runs, the exhibitor to get as much clearance over a succeeding run as possible, because he has no interest in any succeeding run. The distributor, however, has a definite interest. Record p. 710. Clearances as granted apply to all pictures regardless of their quality. Record p. 715.

Martin J. Mullen, vice-president of M & P Theatres, a managing corporation which operates a group of New England theatres affiliated with Paramount, said that clearance is generally negotiated each time a license contract is made, but is actually car-

ried along from year to year and generally understood when once established; that originally, before his time, clearance was established as a result of individual negotiations and followed along the same lines as they were with some changes. Record p. 968. All defendants grant the same clearance to the same theatre. Record p. 977.

John J. Friedl, president and general manager of the Minnesota Amusement Company, a wholly-owned subsidiary of Paramount, said that he generally got from the various distributors the same clearance for the particular theatre for which he is negotiating; that while clearance is negotiated with each license, it generally remains the same, and the same clearance is granted by distributor-defendants and non-defendants alike, Record p. 1003; that clearance is pretty well established, and it is definitely followed in all cases. Record p. 1013.

Morton J. Thalheimer, an independent theatre exhibitor in Richmond, Virginia, called as a witness by Fox, testified that clearance was in effect in Richmond when he first went into business, and it seemed perfectly normal and natural that it should remain that way; that it protects his first-run against his own sub-runs and against his competitors' sub-runs. Record p. 1384. To his knowledge, the system of clearances had existed in Richmond for over nineteen years, during which time there had not been any change. Record p. 1401.

Harold J. Fitzgerald, president of Fox Wisconsin Theatres, Inc., operating sixty-six motion picture theatres in Wisconsin and Michigan, a wholly owned subsidiary of the defendant National Theatres Corporation testified by affidavit that the situation with respect to the licensing of films, and the runs and clearances involved, were much the same in 1928 as they are today, Record p. 1973; that licensing arrangements were vital to distributor and exhibitor and that clearance obviously had a definite effect upon the capacity of his corporation to secure patronage at its top admission price. If Fox Wisconsin undertook to pay a distributor the film rental based upon a high percentage of gross, it

would be interested in clearance over any neighborhood theatre which the distributor might license on a competing subsequent run. Generally, negotiations as to clearance do not take place with respect to each block of pictures licensed because once a fair and reasonable clearance has been determined by the distributor and exhibitor it tends to become fixed, and ordinarily will be the same in a series of contracts in the absence of any unchanged circumstances and conditions. Record p. 1983.

Benjamin Kalmenson, sales manager of Warner Bros. Distributors Corporation, testified that clearances have been pretty well set through the country for a great many years, and are "acquiesced in by exhibitors, producers, independents, affiliates and everybody, until there has grown up a kind of a system of clearance." Record p. 1506.

Robert Mochrie, general sales manager of RKO Radio Pictures, Inc., stated upon his examination that RKO in determining the length of clearance between theatres, takes into consideration the amount of clearance which in its opinion will yield it the largest revenue, taking all theatres into account as a whole and subject to a clearance condition that has built itself up in the city over a period of time. In negotiating licenses, there is frequent occasion to give consideration to the existing clearance between theatres, but they do not consider it anew each time because the factors which determined it originally at some past time remain stable from year to year. He said there are no general or frequent instances in his practice of clearances different in some particular city from those granted by a co-defendant. He usually knows what clearances other distributors are granting. His customer usually tells him what clearance he wants, which is what he is getting from other distributors. He has no agreements with other distributors that he will adopt the same clearance, and his explanation as to why in some instances the clearances granted by RKO to a prior run theatre is the same as a clearance granted by one or more other distributors serving the same theatre is that clearance has been the outgrowth in time between those two theatres, and the

exhibitor buys such products on such a clearance basis and offers the witness the same. Record pp. 1714, 1715.

Abraham Montague, general sales manager of Columbia, testified that in negotiating deals, the "clearance is something we usually find when we arrive there, and we usually negotiate our deal within the clearance we find"; that it would be impracticable and impossible to set up new clearance. Record p. 1268. His company keeps a record of clearances in the community. Record p. 1347. Where his company grants clearance to one theatre over another, it usually follows the pattern set by clearance that is given by other major distributors as well as those which are not majors. He usually does not make any independent determination of whether the clearance is reasonable or unreasonable. He takes it as he finds it, and finding it in most cases standardized, his company does not feel that it is strong enough to change it. Record pp. 1376, 1377.

Paul N. Lazarus, manager of the contract department of United Artists, testified that clearances are "generally understood, and they follow along their established custom." Record p. 1440. For testimony of other witnesses to the same effect as the foregoing, see Record pp. 2012, 2043, 2049, 2086, 2110, 2111.

The fixed character of clearances and the uniformity of the distributor-defendants' practice with reference thereto are shown by the exhibits, as well as the testimony. Many of the franchises, master agreements, and so-called "formula deals" which are in evidence provide that clearances shall be the same as those in effect on the date of the agreement. See Plaintiff's Exhibits 419A (RKO and independent); 419B (RKO and Paramount); 241 (Paramount and Fox); 172 (Paramount and Loew's); 473 (RKO and Universal); 245 (Warner and Fox); 251 (Fox and Paramount); 254 (Fox and RKO). Some of the agreements establish clearances for more than a season. See Plaintiff's Exhibits 181 (3 years, Loew's and Warner); 187 (3 years, Loew's and Fox); 249 (9 years, Loew's and Fox); 259 (3 years, Warner and Universal). Others provide that the clearance is to be no less favorable to the exhibitor than that which had been granted by the distributor for the previous season or in the preceding agreement. See Plaintiff's Exhibits 265, 472, (Columbia and Fox); 190 (RKO and Fox); 199, 272A, 383, (United Artists and Fox).

In some of the agreements, the clearance therein stated was also to be granted to all theatres which the exhibitor-party to the contract might thereafter own, lease, control, manage, or operate. See Plaintiff's Exhibits 172 (Paramount and Loew's); 266, 266A (Columbia and Warner); 471 (Columbia and Loew's); 192 (Fox and Warner). Moreover, the license forms for 1936–37 of Paramount, Fox, Loew's, Warner, RKO, Columbia and Universal, and for 1943–44 of Paramount, Warner, Columbia and Universal, each contain a provision identical or similar to the following: "If clearance is granted against a named theatre or theatres indicating that it is the intention of the Distributor to grant such clearance against all theatres in the immediate vicinity of the Exhibitor's theatre, then unless otherwise provided in the schedule, such clearance shall include any theatre in such vicinity thereafter erected or opened." See Plaintiff's Exhibits 275, 277, 279–281, 283–286, 289, 290.

It is clear that the purpose of these two types of clearance agreements was to fix the run and clearance status of any theatre thereafter opened, not on the basis of its appointments, size, location, and other competitive factors normally entering into such a determination, but rather upon the sole basis of whether it were operated by the exhibitor-party to the agreement.

Much that has been said about clearance is applicable also to runs; the two are practically alike. Clearances are given to protect a particular run against a subsequent run, and the practice of clearance is so closely allied with that of run as to make comment on the one applicable to the other.

Rodgers, of Loew's, testified that a run usually remains static for a given theatre, Record p. 421, and he determines what runs shall be "offered" to an exhibitor. Record p. 418. The size of the theatre does

not necessarily determine whether it is satisfactory for operation on a first run. Record p. 566.

Reagan, of Paramount, said that negotiations with an exhibitor are "usually conducted on the basis of a particular run." In the case of a new theatre, the distributor usually considers whether it wants to do business on the run the theatre would like.[7] In the New York area, second runs are sold by him only to Loew's and RKO. Record pp. 815, 816.

The evidence we have referred to shows that both independent distributors and exhibitors when attempting to bargain with the defendants have been met by a fixed scale of clearances, runs, and admission prices to which they have been obliged to conform if they wished to get their pictures shown upon satisfactory runs or were to compete in exhibition either with the defendants' theatres or with theatres to which the latter have licensed their pictures. Under the circumstances disclosed in the record there has been no fair chance for either the present or any future licensees to change a situation sanctioned by such effective control and general acquiescence as have obtained. See Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 150 F.2d 877, affirmed 326 U.S. ——, 66 S.Ct. 574; Goldman Theatre v. Loew's Inc., 3 Cir., 150 F.2d 738; Youngclaus v. Omaha Film Board of Trade, D.C.Neb., 60 F.2d 538. The only way competition may be introduced into the present system of fixed prices, clearances, and runs is to require a defendant when licensing its pictures to other exhibitors to make each picture available at a minimum fixed or percentage rental and (if clearance is desired) to grant a reasonable clearance and run. When so offered, the licensor shall grant the license for the desired run to the highest bidder if such bidder is responsible and has a theatre of a size, location, and equipment to present the picture to advantage. In other words, if two theatres are bidding and are fairly comparable the one offering the best terms shall receive the license. Thus price fixing among the licensors or between a licensor and its licensees as well as the non-competitive clearance system may be terminated, and the requirements of the Sherman Act, which the present system violates, will be adequately met. The administrative details involved in such changes will require further consideration. We are satisfied that existing arrangements are in derogation of the rights of independent distributors, exhibitors, and the public, and that the proposed changes will tend to benefit them all.

### FORMULA DEALS, MASTER AGREEMENTS, AND FRANCHISES

Formula deals, certain master agreements, and franchises have tended to restrain trade in the distribution and exhibition of motion picture features and in view of the history and relation to the moving picture business of the various parties to this action have exercised unreasonable restraints. In our opinion these restraints will be obviated or at least sufficiently mitigated by requiring a distributor wishing its pictures to be shown outside of its own theatres to offer to license each picture to all theatres desiring to show it on a particular run and, if the theatres are responsibly

---

[7] "Q. And some negotiations are conducted on the basis of a first-run of a product, some second, some subsequent? A. Yes, sir.

"Judge Bright: You mean the particular run is established before the negotiation with the exhibitor?

"The Witness: Sometimes it generally is established, although that has been the result of years of experience that we have had in negotiating with our customers.

"Q. You do not mean that each time there is a negotiation the whole question of run is opened up again? A. No, it is not.

"Q. The policy on which the theatre is operated has usually been established over a long period of time? A. Yes.

"Judge Bright: How about a new theatre or new exhibitor?

"The Witness: There is nothing established there, and we consider all the factors there and make a decision on whether we want to do business with him on the run that we would like to have.

"Q. Now, how is the matter of terms upon which Paramount films will be licensed, determined? A. Determined by negotiation based upon experience we have had with the particular theatre with whom we are negotiating." Record. p. 693.

owned and otherwise adequate, to grant the desired run to the highest bidder.

Formula deals have been entered into by Paramount and by RKO with independent and affiliated circuits. By such agreements a particular circuit has been licensed to exhibit a certain feature in all its theatres at a specified percentage of the national gross receipts realized from that feature by all theatres in the United States. The circuit may allocate playing time and film rentals among the various theatres as it sees fit. See Plaintiff's Exhibits 241, 419A, 419B. Arrangements whereby all the theatres of a circuit are included in a single agreement, and no opportunity is afforded for other theatre owners to bid for the picture in their several areas, seriously and as we hold unreasonably restrain competition. These formula deals have been negotiated without, so far as we are informed, any competition on the part of independent theatre owners who would labor under a great disadvantage in attempting severally to match or outbid the offers of a circuit that was making offers for all of its theatres.

Certain master agreements are open to the same objection as formula deals, for they cover exhibition in two or more theatres in a particular circuit and allow the exhibitor to allocate the film rental paid among the theatres as it sees fit and also to exhibit the features upon such playing time as it deems best, and leaves other terms to the circuit's discretion. See, e.g., Plaintiff's Exhibits 196, 251, 267, 270, 270A, 273, 476. These are different from some other master agreements in which there are separate provisions covering the licensing of the pictures for each particular theatre. See, e.g., Plaintiff's Exhibits 182, 182A, 189, 190, 191, 248. These later agreements in effect only combine in one document a number of theatres with proper licenses for each. This may be done if there is an opportunity for exhibitors to bid for the same runs at an offered price.

Franchises which so far as the five major defendants are concerned were forbidden by the consent decree are also objectionable because they cover too long periods (more than one season) and also because they embrace all the pictures released by a given distributor. They necessarily contravene the plan of licensing each picture, theatre by theatre, to the highest bidder.

It is true that a prohibition of formula deals, master agreements and franchises will interfere with certain contracts which have been made in the past but their formation was a restraint upon trade which was unlawful at the time they were made, and therefore should not be continued. We see no reason to hold that the failure to bring in to this suit one of the contracting parties prevents the issue of an injunction forbidding one who is a party to the suit from continuing to carry out an arrangement which causes unlawful restraints. While our decision will not be res judicata as to those not parties to the litigation, the parties are necessarily and properly bound, and indeed the decision is a judicial precedent against the others on the questions of law involved in those situations we have referred to where they have unreasonably restrained trade and commerce.

In our opinion it follows from the foregoing that provisions in license agreements known as moveovers which give to a licensee the privilege of exhibiting a given picture in a second theatre as a continuation of a run in a first theatre are incompatible with the system we have prescribed of bidding for pictures and runs theatre by theatre. The same would seem to be true of so-called overage-and-underage provisions which are often inserted in licenses to permit an exhibitor owning a number of theatres to apply a deficit in the playing time in one or more others. Under such provisions it is not possible to determine the amount payable for the account of one theatre until the performances in the others have been completed, or practically to apply the bidding system we are establishing. But provisions in licenses for "extended" or "repeat" runs in the same theatre, though apparently criticized by the government, would not seem to be objectionable if reasonably limited in time when other exhibitors are given the opportunity to bid

for similar licenses. Likewise, any other license provisions which may be called to our attention that would substantially interfere with the effectiveness of the bidding system would have to be revised and perhaps may have to be specially dealt with in the decree to follow this opinion.

## BLOCK-BOOKING AND BLIND-SELLING

For many years the distributor-defendants licensed their films in "blocks", or indivisible groups, before they had been actually produced. In such cases the only knowledge prospective exhibitors had of the films which they had contracted for was from a description of each picture by title, plot and players. In many cases licenses for all the films had to be accepted in order to obtain any, though sometimes the exhibitor was given a right of subsequent cancellation for a certain number of pictures. Because of complaints of block-booking and blind-selling based upon the supposed unfairness of contracts which often included pictures—the inferior quality of which could not be known—Sections III and IV of the consent decree required the five consenting distributors to trade-show their films before offering them for license and limited the number which might be included in any contract to five. More than one block of five however could be licensed where the contents of any had been trade-shown. While this restriction in the consent decree has now ceased by time limitation, the consenting distributors have continued to observe the restriction. The non-assenting distributors have retained up to the present time their previous methods of licensing in blocks, but have allowed their customers considerable freedom to cancel the license as to a percentage of the pictures contracted for.

The plaintiff argues that the Sherman Act forbids block-booking in toto. This is said to be because it is illegal to condition the licensing of one film upon the acceptance of another, and it therefore can make no difference whether the group of films involved in a license be two or forty. In our opinion this contention is sound, and any form of block-booking is illegal by which an exhibitor, in order to obtain a license for one or more films, must accept a license for one or more other films.

A patentee who has granted a license in consideration that the patented invention shall be used by the licensee only with unpatented material furnished by the licensor may not restrain as a contributory infringer one who sells to the licensee like materials for like use. Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 60 S.Ct. 278, 88 L.Ed. 396; Morton Salt Co. v. G. S. Suppiger, 314 U.S. 488, 491, 62 S.Ct. 402, 86 L.Ed. 363; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959; Carbice Corp. v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371. Moreover, as was said in Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 670, 64 S.Ct. 268, 273, 88 L.Ed. 376, a decree for an injunction against a contributory infringer would sanction both "a misuse of the patent privilege and a violation of the anti-trust laws." The same rule would appear to apply to copyrights and prevent a suit for contributory infringement by a copyright owner who had licensed the printing of his book, only in connection with paper supplied by him, against a third party supplying paper to the licensee in violation of the agreement. See Interstate Circuit Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Straus v. American Publisher's Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099.

It is true that a copyrighted motion picture when united with another copyrighted picture by block-booking is not tied to an uncopyrighted article. Nevertheless the objections to conditioning the licensing of one picture upon the licensing of another are the same, for the result is to give the copyright owner not only the reward which is his due from the licensing

of a single copyrighted film, but to extend his monopoly by requiring his licensee to accept one or more other films and to pay royalties therefor as an additional consideration. We cannot see that this differs in principle from requiring the licensee to purchase uncopyrighted articles in connection with the license of a copyright. In either case the copyright owner is obtaining something which the decisions have forbidden as beyond the grant of his limited monopoly. Justice Holmes in his dissenting opinion in Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 519, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas.1918A, 959, argued persuasively that the right of the owner of a patent to keep his device out of use included the right to condition its use. Such a doctrine would contravene the rule we are laying down, but his views were rejected by the majority of the Supreme Court in that decision, as well as in Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A. 1917E, 1196, Ann.Cas.1918A, 955, and have proved to be contrary to a long line of subsequent decisions of that court—indeed to have been supplanted by the general trend of authority ever since the days of Henry v. Dick, 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645, Ann.Cas.1913D, 880.

It may be argued that the common law gives a right to condition the licensing of one film upon the acceptance of another—that it is as though the owner of ordinary chattels refused to sell a lot to A unless the latter would purchase in a larger quantity than he desired. The question whether such a contract involving patents or copyrights was good at common law was apparently left open in Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 503, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959, and Keeler v. Standard Folding Bed Co., 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848, and in Federal Trade Commission v. Paramount Famous-Lasky Corp., 2 Cir., 57 F.2d 152, the Court of Appeals for the Second Circuit sustained contracts of block-booking.

Block-booking, when the license of any film is conditioned upon taking of other films, is a system which prevents competitors from bidding for single pictures on their individual merits and adds to the monopoly of a single copyrighted picture that of another copyrighted picture which must be taken and exhibited in order to secure the first. It differs from such a sale of chattels as we have mentioned because it extends a monopoly which the owner of the chattels is not assumed to have. We are not inclined to follow Federal Trade Commission v. Paramount Famous-Lasky Corp., 2 Cir., 57 F.2d 152, for the reason we have given and particularly because of recent decisions of the Supreme Court. As Stone, C. J., said in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 459, 60 S.Ct. 618, 626, 84 L.Ed. 852,—when dealing with the use of one patent to exploit another: " * * * It [Ethyl Gasoline Corporation] has chosen to exploit its patents by manufacturing the fluid covered by them and by selling that fluid to refiners for use in the manufacture of motor fuel. Such benefits as result from control over the marketing of the treated fuel by the jobbers accrue primarily to the refiners and indirectly to appellant, only in the enjoyment of its monopoly of the fluid secured under another patent. The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced in the first. The patent monopoly of one invention may no more be enlarged for the exploitation of a monopoly of another, see Standard Sanitary Mfg. Co. v. United States, supra [226 U.S. 49, 33 S.Ct. 15, 57 L.Ed. 107] than for the exploitation of an unpatented article, United Shoe Machinery Co. v. United States, supra [258 U.S. 451, 42 S. Ct. 363, 66 L.Ed. 708]; Carbice Corporation v. American Patents Corp., supra [283 U. S. 27, 51 S.Ct. 334, 75 L.Ed. 819]; Leitch Manufacturing Co. v. Barber Co., supra [302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371]; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, or for the exploitation or promotion of a business not embraced within the patent. Interstate Circuit v.

United States, supra, 306 U.S. [208], 228–230, 59 S.Ct. [467], 83 L.Ed. 610." See also United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Hartford-Empire Co. v. United States, 323 U.S. 386, 415, 452-3, 65 S.Ct. 373, 89 L.Ed. 322; Mercoid Corp. v. Mid-Continent Investment Co., 320 U. S. 661, 670, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396; United States v. Masonite Corp., 316 U.S. 265, 277-8, 62 S.Ct. 1070, 86 L.Ed. 1461; Interstate Circuit, Inc. v. United States, 306 U.S. 208, 227-230, 59 S.Ct. 467, 83 L.Ed. 610; Stokes & Smith Co. v. Transparent-Wrap Machine Corp., 2 Cir., 156 F.2d 198.

We however declare illegal only that aspect of block-booking which makes the licensing of one copyright conditional upon an agreement to accept a license of one or more other copyrights. A distributor may license to an exhibitor at one time as many films as the latter wishes to receive, but the distributor may not constitute groups of pictures which it refuses to license separately. The distributor may of course not license his pictures at all, but if he does license them, he must do so severally and, in accordance with the bidding procedure previously indicated, must license them to the exhibitor or exhibitors who are qualified and offer the best terms for the various runs.

Blind-selling does not appear to be as inherently restrictive of competition as block-booking, although it is capable of some abuse. By this practice a distributor could promise a picture of good quality or of a certain type which when produced might prove to be of poor quality or of another type—a competing distributor meanwhile being unable to market its product and in the end losing its outlets for future pictures. The evidence indicates that trade-shows, which are designated to prevent such blind-selling, are poorly attended by exhibitors. Record pp. 1178-1179. Accordingly, exhibitors who choose to obtain their films for exhibition in quantities, need to be protected against burdensome agreements by being given an option to reject a certain percentage of their blind-licensed pictures within a reasonable time after they shall have become available for inspection. Such right of rejection has been incorporated in numerous licenses given by the defendants and should be afforded whenever licenses of unproduced films and films not trade-shown are secured by an exhibitor who has made the best competitive bid for them.

■ The only group licensing we are prepared to sanction is licensing by which the group is not offered on condition that the licensee shall take all the pictures included in it, or none, but in which the pictures are separately priced, and each picture is to be sold to the highest duly qualified bidder. As we have already indicated in discussing formula deals, master agreements, and franchises, the offering of pictures should be theatre by theatre, and if more than one picture is included in a license agreement, it will be only because of business convenience and to the extent that each picture so included has received the best bid.

## "POOLING" AGREEMENTS.

It is claimed by plaintiff that the theatre-owning defendants have combined with each other and with independent theatre-owners by "pooling" their theatres through operating agreements, leases, joint stock ownership of theatre-operating corporations, or through joint ownership of theatres in fee. We are asked to determine the validity of these various means of joining interests.

■ By far the most numerous type of agreement in evidence is that by which given theatres of two or more exhibitors, normally in competition with each other, are operated as a unit or most of their business policies collectively determined by a joint committee, or by one of the exhibitors, and by which profits of the "pooled" theatres are divided among the owners according to pre-agreed percentages. See, e. g., Plaintiff's Exhibits 9, 100, 200, 206, 213, 218, 220-221, 223, 226, 226A, 232. Some of the agreements provide that the parties thereto may not acquire other theatres in the competitive vicinity without first offering them for inclusion in the "pool".

See, e. g., Plaintiff's Exhibits 201, 205-206, 219.

These operating agreements we hold to be in clear conflict with the Sherman Act, for through them a defendant-exhibitor reduces to a minimum opposition between its own and other theatres in the "pool". Co-operation, rather than competition, characterizes their operation, and in view of the exhibitor-defendants' financial strength, control of first-class film distribution, ownership of concentrated numbers of first-run theatres, and especially their combination to reduce competition in exhibition through systems of price-fixing and clearances, such restraints as these agreements impose upon free commerce in motion pictures are far less than reasonable. The result is to eliminate competition pro tanto both in exhibition and in distribution of films which would flow almost automatically to the theatres in the earnings of which they have a joint interest.

Other forms of operating agreements are between major defendants and independent exhibitors rather than between major defendants, see, e.g., Plaintiff's Exhibits 97, 118, 208, 238, 239, 358, but we are not of the opinion that this renders them legal. The effect is to ally two or more theatres of different ownership into a coalition for the nullification of competition between them and for their more effective competition against theatres not members of the "pool". Even if the parties to such combinations were not major film producers and distributors, but were all wholly independent exhibitors, such agreements might often be regarded as beyond the reasonable limits of restraint allowance under the Sherman Act. This result is certain when some of the parties are of major stature in the movie industry and have in other ways imposed unlawful restraints upon it, as we have found to be the case upon the record before us.

In certain other cases the operating agreements are accomplished by leases of theatres, the rentals being determined by a stipulated percentage of profits earned by the "pooled" theatres see, e.g., Plaintiff's Exhibits 9, 106, 118, 204. This appears to be but another means of carrying out the illegal objection discussed above. While a theatre-owner may of course remove itself from the business of operating theatres by leasing them to anyone it deems fit upon a fixed rental basis, so long as a monopoly in exhibition is not thereby achieved by the lessee, any arrangement whereby one of the exhibitor-defendants in this case allies its theatres with those of a competing exhibitor, independent or affiliated, and yet itself remains in the trade of exhibiting motion pictures by retaining an interest in the profits earned by the allied theatres, is unlawful under the anti-trust acts.

Many theatres, or the corporations owning them, are held jointly by one or more of the exhibitor-defendants, in some cases in conjunction with independents. See e.g., Plaintiff's Exhibits 8, 9, 46, 48, 62, 164, 355, 387; RKO's Exhibit 11. As these joint interests enable the major defendants to operate theatres collectively, rather than competitively, we find them illegal for the reasons above stated. Appropriate steps should be taken so that no exhibitor-defendant will own theatres (whether represented by fee, beneficial, or stock interests) jointly with other exhibitor-defendants, regardless of the size of the interests involved. Appropriate steps should also be taken so that no exhibitor-defendant or defendants will jointly own a theatre or stock interest therein with any independent exhibitor, except when a defendant or an independent owns an interest of five per cent or less, which we deem de minimis and only to be treated as an inconsequential investment in exhibition. See infra 66 F.Supp. 358. This result may be reached in situations like Florida, Texas, Minnesota and Michigan by a sale, purchase, or exchange of interests in jointly-owned theatres so long as the transaction sought to be achieved will not result in an unreasonable restraint of competition in exhibition within the particular competitive area. To this end the court will control the manner in which rearrangements of these joint interests are effected.

It seems impracticable to do more than lay down general rules as to the foregoing situations. If further details are required to cover specific provisions of the various

pooling agreements, they should be set forth in the decree to be hereafter entered.

■ It should .be added that in our opinion there can be no objection to operating, booking, or film buying through agents, provided the agent is not also acting in respect to theatres owned by other exhibitors, independent or affiliated, and provided that in case the agent is buying films for its principal he does this through the bidding system, theatre by theatre.

## DISCRIMINATION AMONG LICENSEES

The amended and supplemental complaint alleges that in licensing films each of the distributor-defendants has discriminated against small independent exhibitors and in favor of the large affiliated and unaffiliated circuits. Of the various contract provisions by which such discriminations are said to have been accomplished, plaintiff sets forth the following in its brief: suspending the terms of a given contract, if a circuit theatre remains closed for more than eight weeks, and reinstating it without liability upon re-opening, Plaintiff's Exhibits 188, 265, 266, 383, 384, 472, 473; allowing large privileges in the selection and elimination of films, Plaintiff's Exhibits 172, 177, 192, 263–266, 383, 384, 472; allowing deductions in film rentals if double bills are played, Plaintiff's Exhibits 183, 184, 190, 199, 242, 245, 247, 258, 259, 262, 264–266, 271–272a, 274, 382, 383, 473; granting moveovers and extended runs, Plaintiff's Exhibits 182, 182a, 199, 260, 262, 265, 267, 274, 383, 384, 474, 476; granting road-show privileges, Plaintiff's Exhibits 187, 188, 199, 232, 265, 266, 383, 384, 472; allowing overage and underage, Plaintiff's Exhibits 190, 191, 194, 259, 265, 266, 383; granting unlimited playing time, Plaintiff's Exhibits 241, 267, 269, 471; excluding foreign pictures and those of independent producers, Plaintiff's Exhibits 173, 174, 181, 190, 191, 194, 199, 262, 265, 266, 272a, 383, 384, 395, 470–472; granting rights to question the classification of features for rental purposes, Plaintiff's Exhibits 187, 232, 259, 265, 472, 473; and especially, discriminating in film rentals, clearances, and minimum admission prices, see Plaintiff's Brief pp. 56–70, 75–85.

■ These provisions are found most frequently in franchises and master agreements, which are made with the larger circuits of affiliated and unaffiliated theatres. Record pp. 1432, 1433; Columbia's Exhibit 9a; Universal's Exhibit 2; Plaintiff's Exhibits 195, 198, 259, 261, 265–266a, 384, 396, 470–473. Small independents are usually licensed, however, upon the standard forms of contract, which do not include them. Record pp. 1432, 1433; Plaintiff's Exhibits 275–290. The competitive advantages of these provisions are so great that their inclusion in contracts with the larger circuits constitutes an unreasonable discrimination against small competitors in violation of the anti-trust laws. It seems unnecessary to decide whether the record before us justifies a reasonable inference that the distributor-defendants have conspired among themselves to discriminate among their licensees, for each discriminating contract constitutes a conspiracy between the licensee and licensor. Interstate Circuit Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160.

■ The defendants argue that these privileges granted to the circuits flow from their negotiations with the individual theatre-owners rather than from a standard policy of discrimination deliberately pursued by them. This is perhaps true, but the result is the same whether the bargaining power of the large exhibitors forces upon the distributors a discriminatory policy, or whether the latter voluntarily carry such a policy into effect. Acquiescence in an unreasonable restraint, as well as the creation of such a restraint, violates the Sherman Act. Under the bidding system we are requiring such discriminations would appear impossible. Those provisions which are not compatible with the operation of this system, or which are inherently unreasonable, such as a provision for a clearance between theatres where there is no substantial competition, will no longer be includible in licenses, as mentioned elsewhere, but otherwise the bidders will compete for licensing contracts on a parity, in that the same offer will be made to all prospective exhibitors in a community.

The foregoing is not to be construed, however, as indicating that the distributor-defendants have discriminated among their licensees with respect to film rentals, clearances, or minimum admission prices. They have perhaps done so, but we are without sufficient knowledge of the many factors entering into the determination of these provisions such as the character of specific communities, the nature of the different theatre appointments, of the patrons, operating policies, locations, and responsibility of operators. In the absence of such facts, we are unable to infer that the distributor-defendants have violated the Sherman Act in this particular regard, but any discriminations in the other ways noted above in favor of affiliated licensee or licensees connected with independent circuits as against individual independents must be enjoined and we believe will not exist in future licenses under the bidding system for which we are providing.

## DIVESTITURE OF THEATRES

We cannot accede to the prayer of the plaintiff that the major defendants should be divested of their theatres in order that no distributor of motion pictures shall be an exhibitor. Undoubtedly such a step while not ipso facto preventing price-fixing agreements or unreasonable clearance would terminate the government's most urgent objections to the present methods of conducting the motion picture business, but it would also withdraw the defendant-distributors from competition in the exhibition field and at the same time would create a new set of theatre owners which would be quite unlikely for some years to give the public as good service as the exhibitors they would have supplanted in view of the latter's demonstrated experience and skill in operating what must be regarded as in general the largest and best equipped theatres. We think that the opportunity of independents to compete under the bidding system for pictures and runs renders such a harsh remedy as complete divestiture unnecessary, at least until the efficiency of that system has been tried and found wanting.

In the year 1945 there were about 18,076 motion picture theatres in the United States of which the five major defendants had interests in 3,137, or 17.35 per cent. Of the latter, Paramount or its subsidiaries owned independently of the other defendants 1395—a little less than half, or about 7.72 per cent; Warner 501, or about 2.77 per cent; Loew's 135, or about .74 per cent; Fox 636, or about 3.52 per cent, and RKO 109, or about .60 per cent. There were 361 theatres, or about 2.00 per cent, in which two or more of these defendants had joint interests, whether held directly or indirectly through stock ownership in the same corporation or through a lease or operating agreement. This tabulation excludes theatres connected with one or more of the defendants through film-buying or management contracts or through corporations in which a defendant owns an indirect minority stock interest. It includes all theatres in which each defendant otherwise owns a direct or indirect interest of any amount. See Loew's Exhibit 2; RKO's Exhibit 11; Plaintiff's Exhibits 8, 9, 12, 13, 22, 47, 48, 64, 87, 88, 97, 100, 118–120, 156–164, 360.

It would seem unlikely that theatre owners having aggregate interests of little more than one-sixth of all the theatres in the United States are exercising such a monopoly of the motion picture business that they should be subjected to the drastic remedy of complete divestiture in order to effect a proper degree of free competition. It is only in certain localities, and not in general, that an ownership even of first-run theatres approximating monopoly exists. Under the proposed system, the only theatres the competition of which in exhibition even Paramount—the largest owner—would in anywise control are the 7.72 per cent which it now owns. Each of the other four major defendants would control a far smaller percentage of the theatres. Even in places like Philadelphia and Cincinnati, where Warner and RKO have owned all the first-run theatres, their theatre interests cannot properly be aggregated to establish a conspiracy in restraining exhibition, for in such localities there would seem to be nothing to prevent

other persons from building theatres of a similar type if the market for the distribution of films should be opened to the highest bidder and the builder of a new theatre could compete with the other theatre owners in obtaining pictures for exhibition in the theatre he had built. The only pictures that the present sole exhibitors in such localities could control would be their own, which they can always exhibit freely in their own theatres.

In about 60 per cent of the 92 cities having populations of over 100,000 on which the government mainly relies to prove its case, there are independent first-run theatres in competition with those of the major defendants except so far as it may be restricted by the trade practices we have criticized.[8] In about 91 per cent of these cities there is competition in first runs between independents and some of the major defendants or among the major defendants themselves, except so far as it may be restricted by the above trade practices.[9] If the bidding system we propose be set up, minimum admission prices in licenses eliminated, and the other restrictive agreements which we have discussed terminated, it is our opinion that adequate competition would exist. Indeed in all of the 92 cities, even where there is no present competition in first runs there is always competition in some run.

Moreover, there is no substantial proof that any of the corporate defendants was organized or has been maintained for the purpose of achieving a national monopoly, as was the case in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, and United States v. Aluminum Co. of America, 2 Cir., 148 F. 2d 416. The five major defendants cannot be treated collectively so as to establish claims of general monopolization in exhibition. They can only be restrained from the unlawful practices in fixing minimum prices, obtaining unreasonable clearances, block-booking, and other things we have criticized.

If in certain localities there is ownership by a single defendant of all the first-run theatres, there is no sufficient proof that it has been for the purpose of creating a monopoly and has not rather arisen from the inertness of competitors, their lack of financial ability to build theatres comparable to those of the defendants, or from the preference of the public for the best equipped houses and not from "inherent vice" on the part of these defendants. Each defendant had a right to build and to own theatres and to exhibit pictures in them, and it takes greater proof than that each of them possessed great financial strength, many theatres, and exhibited the greater number of first-runs to deprive it of the ordinary rights of ownership. Outside the limits of the trade practices and agreements which we have found to violate the anti-trust laws and which will under the final decree be abolished, there is general competition among all the defendants as well as between them and independent distributors for the exhibition of their various pictures. Record p. 1062.

As was said by the expediting court in United States v. The Pullman Co., D.C. E.D.Pa., 1945, 64 F.Supp. 108, 112: "If there is only one store in a town at which every one trades, that fact does not itself constitute a monopoly in the legal sense. It is only when the merchant maintains his position by devices which compel every one to trade with him exclusively that the situation becomes legally objectionable."

[8] According to Loew's Exhibit 13 and RKO's Exhibit 11, there are independent first-run theatres in all but the following 38 cities: Albany, Bridgeport, Charlotte, Chattanooga, Cincinnati, Cleveland, Columbus, Dallas, Dayton, DesMoines, Elizabeth, Erie, Flint, Fort Worth, Grand Rapids, Houston, Jersey City, Kansas City, Mo., Knoxville, Lowell, Memphis, Milwaukee, Minneapolis, Newark, New Haven, Norfolk, Omaha, Paterson, Peoria, Rochester, San Antonio, Scranton, South Bend, Syracuse, Toledo, Wichita, Worcester, Yonkers.

[9] Upon the termination of "pooling" agreements a major defendant may control all of the first-run theatres in only the following 8 cities: Charlotte, Chattanooga, Cincinnati, Erie, Knoxville, Peoria, South Bend, Wichita. Loew's Exhibit 13; RKO's Exhibit 11.

In the case at bar, as we have reiterated, many of the objections are to the trade practices we have alluded to, and not to the ownership of theatres either by the major defendants or by their wholly-owned subsidiaries. If those theatres were all owned by entirely independent corporations the distributing-producing defendants, if not in competition in the distribution of their films, would control competition in the exhibition business by in the aggregate controlling the distribution of most of the best pictures in the United States and imposing restrictions upon their use. The root of the difficulties we have discovered lies not in the ownership of many or most of the best theatres by the producer-distributors, but in price-fixing, noncompetitive granting of runs and clearances, unreasonable clearances, formula deals, master agreements, franchises, blockbooking, pooling agreements and certain discriminations among licensees between defendants and independents. These practices, if employed in the future, in favor of powerful independents would effect all of the undesirable results that have existed when the five major defendants and their subsidiaries have owned or controlled numerous theatres in which the defendants' pictures have been exhibited. That such would be the case seems amply demonstrated by the decisions where powerful independent circuits were involved. United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160; Interstate Circuit Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. If the objectionable trade practices were eliminated, the only difference between such an assumed situation in which the defendants owned no theatres and the present would be the inability of the major defendants to play their own pictures in their own theatres. The percentage of pictures on the market which any of the five major defendants could play in its own theatres would be relatively small and in nowise approximates a monopoly of film exhibition.[10]

There has however been restraint of competition in exhibition by the five major defendants through ownership of theatres jointly with one another or if their interest be more than five per cent even where jointly held with independents which, in our opinion, calls for a divestiture of such interests whether such partial interest is in fee or through stock ownership or otherwise.

 There is no evidence that in a city such as Cincinnati, in which a major defendant owns all of the first-run theatres, other exhibitors, affiliated or unaffiliated,

[10] The following table is derived from Plaintiff's Exhibit 426 and Record pp. 2400, 2401:

Feature Films Released During The 1943–44 Season By All Distributors.

| | No. of Films | Percentages of Total With "Westerns" included: | Percentages of Total With "Westerns" excluded: |
|---|---|---|---|
| Fox | 33 | 8.31% | 9.85% |
| Loew's | 33 | 8.31% | 9.85% |
| Paramount | 31 | 7.81% | 9.25% |
| RKO | 38 | 9.57% | 11.34% |
| Warner | 19 | 4.79% | 5.67% |
| Columbia | 41 | 10.32% | 12.24% |
| United Artists | 16 | 4.04% | 4.78% |
| Universal | 49 | 12.34% | 14.63% |
| Republic | 29 features / 30 "Westerns" | 14.86% | 8.66% |
| Monogram | 26 features / 16 "Westerns" | 10.58% | 7.76% |
| PRC | 20 features / 16 "Westerns" | 9.07% | 5.97% |
| Totals | 397 / 335 without "Westerns" | 100% | 100% |

have been prevented from also owning theatres for exhibition on first-run and there consequently is no monopoly in the legal sense, see United States v. Pullman Co., D.C., 64 F.Supp. 108, 112, and no reason for directing a divestiture. But when theatres are jointly owned by a major defendant and another party, it is evident that both joint owners wish to participate and indeed are directly or indirectly participating in the business of exhibiting motion pictures. In such case their joining of interests is illegal under the anti-trust laws for the reason that the major defendant thereby eliminates putative competition between itself and the other joint owner, who otherwise would be in a position to operate theatres independently. Such an elimination of competition is unreasonable in view of the defendant's being a powerful factor in the industry capable of exerting vast influence to its ends, and of the methods it has employed to restrain and control normal competition in distributing and exhibiting motion pictures through price-fixing, system of clearances, block-booking, pooling and the other practices we have alluded to.

We find such joint interests in a great number of theatres, a summary of which is set forth below,[11] and hold that they must be terminated by a sale to, or purchase from the co-owner or owners, or by a sale to a party not one of the other defendant-exhibitors. The decree or subsequent orders to be entered in conformity with this opinion will control sales or exchanges of such fractional interests for the purpose of restoring or creating a reasonable competition in the areas in question.

## GENERAL CONSIDERATIONS

It may be said that such restrictions in commercial dealings as we would impose will interfere with the right of a copyright owner to chose his customers or contract for the disposition of his own property. The answer is that no such absolute right exists where its exercise will involve an extension of a copyright monopoly or an unreasonable interference with competition in the distribution and exhibition of moving pictures. A system of fixed admission prices, clearances and block-booking is so restrictive of competition in its tendency that it should be modified to comply with the terms of the Sherman Act. The modifications in practices we have indicated will relieve conditions that have grown up through the years. Indeed the practices are defended on the ground that business convenience and long usage ought to sanction them. But, in spite of their long continuance, we cannot escape the conclusion that in various ways the system stifles competition and violates the law and that business convenience and loyalty to former customers afford a lame excuse for depriving others of rights to compete and for perpetuating unreasonable restrictions. The remedy we are giving against the infractions is certainly no more drastic in effect than the one the Supreme Court granted in Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, nor more

---

[11] In so far as information could accurately be obtained from RKO's Exhibit 11, the numbers of theatres jointly owned by the defendants are approximately as follows:

Theatres Jointly Owned With Independents:

| | |
|---|---|
| Paramount | 993 |
| Warner | 20 |
| Fox | 66 |
| RKO | 187 |
| Loew's | 21 |

Theatres Jointly Owned By Two Defendants:

| | |
|---|---|
| Paramount–Fox | 6 |
| Paramount–Loew's | 14 |
| Paramount–Warner | 25 |
| Paramount–RKO | 150 |
| Loew's–RKO | 3 |
| Loew's–Warner | 5 |
| Fox–RKO | 1 |
| Warner–RKO | 10 |

Total...1,501 Theatres

Of the above theatres jointly owned with independents, the following numbers will not be affected by the decree, since the defendant or co-owning independent owns less than a 5% interest:

| | |
|---|---|
| Paramount | 177 |
| RKO | 32 |

Total 209 Theatres

Total affected by the decree according to RKO'S Exhibit 11 1,292 Theatres

severe than the one it imposed in United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254, 89 L.Ed. 160. The defendants have built up great business enterprises in a very popular field. Yet they have carried on practices we have found unduly restrictive of interstate commerce and even though we do not suggest that they any more than "those eighteen upon whom the tower in Siloam fell" have been "sinners above all men", yet measures should be taken to restore the moving picture business to a condition of competition that will benefit both competitors and the general public and to abate practices that are unlawful.

It is argued that the steps we have proposed would involve an interference with commercial practices that are generally acceptable and a hazardous attempt on the part of judges—unfamiliar with the details of business—to remodel its delicate adjustments which have hitherto provided the public with what is a new and great art. But we see nothing ruinous in the remedies proposed. Disputes which may arise under the bidding system are likely to relate to questions whether the bidder has a theatre adequate for the run for which he bids, whether the clearance requested is reasonable as regards his own theatre and those of others, and similar matters generally involved in comparing bids. If the defendants will consent to an arbitration system for the determination of such disputes of the kind that has worked so well under the consent decree, they will facilitate the adjustment of most of the differences that are likely to occur, with a large saving of time and money as compared with separate court actions.

A suit in the district court for violation of the Sherman Act is doubtless an awkward way to cure such ills as have arisen, but it is perhaps the best remedy now available to the government. There surely are evils in the existing system, and the Sherman Act provides a mode of correction which is lawfully invoked. At all events, that which is written is written, and is controlling on us.

It does not follow from the foregoing that we should wholly break up the exhibition business of each of the major defendants even though a "root and branch" decree might be legally possible. Such total divestiture would be injurious to the corporations concerned, and, if we are right in our analysis of the situation, we should still have to give relief against price-fixing, systems of clearance, formula deals, master agreements and franchises, block-booking, pooling agreements, and other agreements we have held invalid. The relief proposed we believe should suffice, while total divestiture would be damaging to the public as well as to the defendants and not accomplish any useful purpose at the present time.

## THE DECREE

A decree is granted in accordance with the views expressed in the foregoing opinion to be settled on ten days' notice. It should provide for the dismissal of all claims asserted by the plaintiff against any of the defendants which act only as producers of motion pictures and for the dismissal of claims against any other defendants based on their acts as producers, whether as individuals or in conjunction with others.

The granting of licenses by any of the defendant-distributors which fix minimum prices for admission to theatres either of the defendants or of any other exhibitor should be enjoined in which such minimum admission prices are fixed by the parties either in writing, or through a committee, or through arbitration, or upon the happening of any event, or in any other wise.

The defendants should be enjoined from concertedly agreeing to maintain a system of clearances as among themselves or with other exhibitors, and no clearances should be granted against theatres in substantial competition with the theatre receiving a license for exhibition in excess of what is reasonably necessary to protect the licensee in the run granted. Existing clearances in excess of what is reasonably necessary to protect the licensees in the runs awarded to them shall be invalid pro tanto. In determining what is a reasonable clearance the following factors should be taken into consideration:

(1) The admission prices of the theatres involved, as set by the exhibitor;

(2) The character and location of the theatres involved, including size, type of entertainment, appointments, transit facilities, etc.;

(3) The policy of operation of the theatres involved, such as the showing of double features, gift nights, give-aways, premiums, cut-rate tickets, lotteries, etc.;

(4) The rental terms and license fees paid by the theatres involved and the revenues derived by the distributor-defendant from such theatres;

(5) The extent to which the theatres involved compete with each other for patronage;

(6) The fact that a theatre involved is affiliated with a defendant-distributor or with an independent circuit of theatres should be disregarded; and

(7) There should be no clearance between theatres not in substantial competition.

The further performance by any of the defendants of existing formula deals, master agreements to the extent that we have previously found them invalid, or franchises should be enjoined, and the defendants should also be enjoined from entering into or carrying out any similar agreements in the future.

Defendants owning a legal or equitable interest in theatres of ninety-five per cent or more either directly or through subsidiaries may exhibit pictures of their own or of their wholly owned subsidiaries in such theatres upon such terms as to admission prices and clearances and on such runs as they see fit.

No defendant or its subsidiaries shall exhibit its films other than on its own behalf or through wholly owned subsidiaries, or subsidiaries in which it has an interest of at least ninety-five per cent, without offering the license at a minimum price for any run desired by the operators of each theatre within the competitive area. The license desired shall in such case be granted to the highest responsible bidder having a theatre of a size and equipment adequate to show the picture upon the terms offered.

The license shall be granted solely upon the merits and without discrimination in favor of affiliates, old customers, or any person whatever. Each license shall be offered and taken theatre by theatre and picture by picture. No contracts for exhibition shall be entered into, or if already outstanding shall be performed, in which the license to exhibit one feature is conditioned upon an agreement of the licensee to take a license of one or more other features, but licenses to exhibit more than one feature may be included in a single instrument provided the licensee shall have had the opportunity to bid for each feature separately and shall have made the best bid for each picture so included. To the extent that any of the pictures have not been trade-shown prior to the granting of a license for more than a single picture, the licensee shall be given by the licensor the right to reject a percentage of such pictures not trade-shown prior to the granting of the license to be fixed by the decree. But that right to reject any picture must be exercised within ten days after there has been an opportunity afforded to the licensee to inspect it.

The defendants shall be enjoined from entering into or continuing to perform existing pooling agreements whereby given theatres of two or more exhibitors, normally in competition, are operated as a unit or whereby the business policies of such exhibitors are collectively determined by a joint committee, or by one of the exhibitors, or whereby profits of the "pooled" theatres are divided among the owners according to pre-agreed percentages. They shall also be enjoined from making or continuing to perform agreements that the parties may not acquire other theatres in the competitive area without first offering them for inclusion in the pool. The making or continuance of leases of theatres under which defendants lease any of their theatres to another defendant or to an independent operating a theatre in the competitive area in return for a share of the profits shall be enjoined.

Each defendant shall cease and desist from ownership of an interest in any theatre, whether in fee or in stock or other-

wise, in conjunction with another defendant-exhibitor. Each defendant shall cease and desist from ownership, jointly with an independent, of an interest in any theatre, greater than five per cent, unless such defendant's interest is ninety-five per cent or more; and where the interest of such defendant is more than five per cent and less than ninety-five per cent, such joint interests shall be dissolved either by a sale to, or by a purchase from, such co-owner or co-owners. Rearrangements of such joint interests with an independent, if by purchase, shall, however, be subject to the direction of this court so that their effectuation may promote competition in the exhibition of motion pictures. Where a defendant owns a ninety-five or greater per cent interest in any theatre, such theatre may be considered as its own so far as this opinion and the decree to be entered hereon are concerned. Each of the defendants shall be enjoined from expanding its theatre holdings except for the purpose of acquiring a co-owner's interest in jointly owned theatres, and this only in cases where the court shall permit such acquisition, instead of requiring an outright sale of the undivided interest of the defendant in question. The foregoing provision as to divestiture of partial interests in theatres shall apply both to interests held in fee and beneficially and to those represented by shares of stock. But it shall not prevent a defendant from acquiring theatres or interests therein in order to protect its investments, or in order to enter a competitive field; if in the latter case, this court or other competent authority shall approve the acquisition after due application is made therefor.

Each defendant shall be enjoined from operating, booking or film-buying through any agent who is also acting in such matters for any other exhibitor, independent or affiliated.

The decree shall also provide for arbitration of disputes as to bids, clearances, runs, and any other subjects appropriate for arbitration in respect to all parties who may consent to the creation of such tribunals for adjustment of such disputes. It shall also provide for an appeal board generally similar to the one created by the consent decree as to any parties consenting thereto. It shall make such disposition of the provisions of the existing consent decree signed November 30, 1940, as may be necessary in view of the foregoing opinion.

In order to secure compliance with the decree to be entered, duly authorized representatives of the Department of Justice shall on the written request of the Attorney General or the Assistant Attorney General in charge of anti-trust matters, and on reasonable notice to the defendant or defendants affected, be permitted reasonable access to all books and papers of the defendants and reasonable opportunity to interview their officers or employees, as provided in Section XVIII of the Consent Decree.

Proceedings under the decree to be entered shall be stayed pending appeal or for the purpose of enabling the parties to adjust their business without an unfair burden or as practice may require upon such terms as the decree shall provide.

Jurisdiction of this cause should be retained for the purpose of enabling any of the parties to the decree to apply to the court at any time for such orders or directions as may be necessary or appropriate for the construction or carrying out of the same, for the enforcement of compliance therewith, and for the punishment of violations thereof, or for other or further relief.

Findings should be proposed by the parties for the assistance of the court, but such proposed findings will form no part of the record.